CENTRAL HARDWARE CO. *v.* NATIONAL LABOR
RELATIONS BOARD ET AL.

No. 70–223.   Argued April 18, 1972—Decided June 22, 1972

POWELL, J., delivered the opinion of the Court, in which BURGER,
C. J., and STEWART, WHITE, BLACKMUN, and REHNQUIST, JJ., joined.
MARSHALL, J., filed a dissenting opinion, in which DOUGLAS and
BRENNAN, JJ., joined, *post,* p. 548.

*Ronald L. Aylward* argued the cause for petitioner.
With him on the briefs was *Keith E. Mattern.*

*Norton J. Come* argued the cause for respondent National Labor Relations Board. With him on the brief were *Solicitor General Griswold* and *Peter G. Nash.* *Bernard Dunau* argued the cause for respondent Retail Clerks Union Local 725. With him on the brief was *Carl L. Taylor.*

Briefs of *amici curiae* urging reversal were filed by *Lawrence M. Cohen, Jerry Kronenberg, Gerard C. Smetana,* and *Alan Raywid* for the American Retail Federation, and by *Phil B. Hammond* for Levitz Furniture Corp.

*J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

MR. JUSTICE POWELL delivered the opinion of the Court.

Petitioner, Central Hardware Co. (Central), owns and operates two retail hardware stores in Indianapolis, Indiana. Each store is housed in a large building, containing 70,000 square feet of floor space, and housing no other retail establishments. The stores are surrounded on three sides by ample parking facilities, accommodating approximately 350 automobiles. The parking lots are owned by Central, and are maintained solely for the use of Central's customers and employees. While there are other retail establishments in the vicinity of Central's stores, these establishments are not a part of a shopping center complex, and they maintain their own separate parking lots.

Approximately a week before Central opened its stores, the Retail Clerks Union, Local 725, Retail Clerks International Association, AFL–CIO (the Union), began an organization campaign at both stores. The campaign consisted primarily of solicitation by nonemployee Union

organizers on Central's parking lots. The nonemployee organizers confronted Central's employees in the parking lots and sought to persuade them to sign cards authorizing the Union to represent them in an appropriate bargaining unit. As a part of the organization campaign, an "undercover agent for the Union" was infiltrated into the employ of Central, receiving full-time salary from both the Union and the company. This agent solicited employees to join the Union, and obtained a list of the employees of the two stores which was about 80% complete.

Central had a no-solicitation rule which it enforced against all solicitational activities in its stores and on its parking lots. A number of employees complained to Central's local management that they were being harassed by the organizers, and these complaints were forwarded to Central's corporate headquarters in St. Louis, Missouri. The St. Louis officials directed the Indianapolis management to enforce the nonemployee no-solicitation rule and keep all Union organizers off the company premises, including the parking lots. Although most of the nonemployee Union organizers had either left Indianapolis or ceased work on the Central organization campaign, the Indianapolis management had occasion to assert the nonemployee no-solicitation rule on several occasions.

One arrest was made when a field organizer for the Union was confronted by the manager of one of the stores on its parking lot, and refused to leave after being requested to do so. The field organizer asserted that he was a "customer" and insisted upon entering the store. The police were called, and when the organizer persisted in his refusal to leave, he was arrested.

Shortly after Central received complaints from its employees as to harassment by the organizers, Central filed unfair labor practice charges against the Union.

The Union subsequently filed unfair labor practice charges against Central. After an investigation, the General Counsel of the National Labor Relations Board (the Board) dismissed Central's charges against the Union, and issued a complaint against Central on the Union's charges.

The Board held that Central's nonemployee no-solicitation rule was overly broad, and that its enforcement violated § 8 (a)(1) of the National Labor Relations Act. The Board reasoned that the character and use of Central's parking lots distinguished the case from *NLRB* v. *Babcock & Wilcox Co.*, 351 U. S. 105 (1956), and brought it within the principle of *Amalgamated Food Employees Union* v. *Logan Valley Plaza*, 391 U. S. 308 (1968). 181 N. L. R. B. 491 (1970). A divided Court of Appeals for the Eighth Circuit agreed, and ordered enforcement of the Board's order enjoining Central from enforcing any rule prohibiting nonemployee Union organizers from using its parking lots to solicit employees on behalf of the Union. 439 F. 2d 1321 (1971). We granted certiorari to consider whether the principle of *Logan Valley* is applicable to this case. 404 U. S. 1014 (1972). We conclude that it is not.

## I

Section 7 of the National Labor Relations Act, as amended, 61 Stat. 140, 29 U. S. C. § 157, guarantees to employees the right "to self-organization, to form, join, or assist labor organizations." This guarantee includes both the right of union officials to discuss organization with employees, and the right of employees to discuss organization among themselves.[1] Section 8 (a)(1) of the Act, as amended, 29 U. S. C. § 158 (a)(1), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaran-

---

[1] See *Thomas* v. *Collins*, 323 U. S. 516, 533–534 (1945).

teed" in § 7. But organization rights are not viable in a vacuum; their effectiveness depends in some measure on the ability of employees to learn the advantages and disadvantages of organization from others. Early in the history of the administration of the Act the Board recognized the importance of freedom of communication to the free exercise of organization rights. See *Peyton Packing Co.,* 49 N. L. R. B. 828 (1943), enforced, 142 F. 2d 1009 (CA5), cert. denied, 323 U. S. 730 (1944).

In seeking to provide information essential to the free exercise of organization rights, union organizers have often engaged in conduct inconsistent with traditional notions of private property rights. The Board and the courts have the duty to resolve conflicts between organization rights and property rights, and to seek a proper accommodation between the two. This Court addressed the conflict which often arises between organization rights and property rights in *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105 (1956). The Babcock & Wilcox Co. operated a manufacturing plant on a 100-acre tract about one mile from a community of 21,000 people. The plant buildings were enclosed within a fence, employee access being through several gates. Approximately 90% of the employees drove to work in private cars, and the company maintained a parking lot for the employees. Only employees and deliverymen normally used the parking lot. The company had a rule forbidding the distribution of literature on company property. The Board found that the company's parking lot and the walkway leading from it to the plant entrance were the only "safe and practicable" places in the vicinity of the plant for distribution of union literature, and held the company guilty of an unfair labor practice for enforcing the no-distribution rule and thereby denying union organizers limited access to company property. The Board ordered the com-

pany to rescind its no-distribution rule insofar as it related to nonemployee union representatives seeking to distribute union literature on the parking lot and walkway area.[2]

The Court of Appeals for the Fifth Circuit refused enforcement of the Board's order on the ground that the Act did not authorize the Board to impose a servitude on an employer's property where no employee was involved.[3] This Court affirmed on the ground that the availability of alternative channels of communication made the intrusion on the employer's property rights ordered by the Board unwarranted. The Court in *Babcock* stated the guiding principle for adjusting conflicts between § 7 rights and property rights:

> "Organization rights are granted to workers by the same authority, the National Government, that preserves property rights. Accommodation between the two must be obtained with as little destruction of one as is consistent with the maintenance of the other. The employer may not affirmatively interfere with organization; the union may not always insist that the employer aid organization. But when the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize." 351 U. S., at 112.

The principle of *Babcock* is limited to this accommodation between organization rights and property rights. This principle requires a "yielding" of property rights only in the context of an organization cam-

[2] *Babcock & Wilcox.Co.,* 109 N. L. R. B. 485, 486 (1954).
[3] *NLRB* v. *Babcock & Wilcox Co.,* 222 F. 2d 316 (CA5 1955).

paign. Moreover, the allowed intrusion on property rights is limited to that necessary to facilitate the exercise of employees' § 7 rights. After the requisite need for access to the employer's property has been shown, the access is limited to (i) union organizers; (ii) prescribed nonworking areas of the employer's premises; and (iii) the duration of organization activity. In short, the principle of accommodation announced in *Babcock* is limited to labor organization campaigns, and the "yielding" of property rights it may require is both temporary and minimal.

## II

The principle applied in *Amalgamated Food Employees Union* v. *Logan Valley Plaza*, 391 U. S. 308 (1968), is quite different. While it is true that *Logan Valley* involved labor picketing, the decision rests on constitutional grounds; it is not a § 7 case.

*Logan Valley* had its genesis in *Marsh* v. *Alabama*, 326 U. S. 501 (1946). *Marsh* involved a "company town," an economic anachronism rarely encountered today. The town was wholly owned by the Gulf Shipbuilding Corp., yet it had all of the characteristics of any other American town. Gulf Shipbuilding held title to all the land in the town, including that covered by streets and sidewalks. Gulf Shipbuilding also provided municipal services, such as sewerage service and police protection, to the residents of the town. A Jehovah's Witness undertook to distribute religious literature on a sidewalk near the post office in the "business block" of the town, and was arrested on a trespassing charge. She was subsequently convicted of the crime of trespassing, and the Alabama courts upheld the conviction on appeal. This Court reversed, holding that Alabama could not permit a corporation to assume the functions of a municipal government and at the same

time deny First Amendment rights through the application of the State's criminal trespass law.

In *Logan Valley,* over a strong dissent by Mr. Justice Black, the author of *Marsh,* the Court applied the reasoning of *Marsh* to a modern economic phenomenon, the shopping center complex. The Logan Valley Mall was a complex of retail establishments, which the Court regarded under the factual circumstances as the functional equivalent of the "community business block" of the company town in *Marsh.* The corporate owner of Logan Valley Mall obtained a state court injunction against peaceful picketing on the shopping center property, and the Pennsylvania Supreme Court affirmed the issuance of the injunction on the ground that the picketing constituted a trespass on private property. This Court reversed, holding that Pennsylvania could not "delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put." 391 U. S., at 319–320.

## III

The Board and the Court of Appeals held that *Logan Valley* rather than *Babcock* controlled this case. The Board asserts that the distinguishing feature between these two cases is that in *Logan Valley* the owner had "diluted his property interest by opening his property to the general public for his own economic advantage." [4] The emphasis, both in the argument on behalf of the Board and in the opinion below, is on the opening of the property "to the general public." [5]

---

[4] Brief for the NLRB 20.

[5] 439 F. 2d, at 1326–1328.

This analysis misconceives the rationale of *Logan Valley*.[6] *Logan Valley* involved a large commercial shopping center which the Court found had displaced, in certain relevant respects, the functions of the normal municipal "business block." First and Fourteenth Amendment free-speech rights were deemed infringed under the facts of that case when the property owner invoked the trespass laws of the State against the pickets.

Before an owner of private property can be subjected to the commands of the First and Fourteenth Amendments the privately owned property must assume to some significant degree the functional attributes of public property devoted to public use. The First and Fourteenth Amendments are limitations on state action, not on action by the owner of private property used only for private purposes. The only fact relied upon for the argument that Central's parking lots have acquired the characteristics of a public municipal facility is that they are "open to the public." Such an argument could be made with respect to almost every retail and service establishment in the country, regardless of size or location. To accept it would cut *Logan Valley* entirely away from its roots in *Marsh*. It would also constitute an unwarranted infringement of long-settled rights of private property protected by the Fifth and Fourteenth Amendments. We hold that the Board and the Court of Appeals erred in applying *Logan Valley* to this case.

The Trial Examiner concluded that no reasonable means of communication with employees were available to the nonemployee Union organizers other than solicitation in Central's parking lots. The Board adopted this conclusion. Central vigorously contends that this

---

[6] For a full discussion of *Logan Valley* and the circumstances in which it is applicable, see the decision of the Court today in *Lloyd Corp.* v. *Tanner, post,* p. 551.

conclusion is not supported by substantial evidence in the record as a whole. The Court of Appeals did not consider this contention, because it viewed *Logan Valley* as controlling rather than *Babcock*. The determination whether on the record as a whole there is substantial evidence to support agency findings is a matter entrusted primarily to the courts of appeals. *Universal Camera Corp.* v. *NLRB*, 340 U. S. 474 (1951). Since the Court of Appeals has not yet considered this question in light of the principles of *NLRB* v. *Babcock & Wilcox Co., supra,* the judgment is vacated, and the case will be remanded to that court for such consideration.

*It is so ordered.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, dissenting.

I agree with the Court that this case should have been considered under *NLRB* v. *Babcock & Wilcox Co.*, 351 U. S. 105 (1956). That case is, as the opinion of the Court suggests, narrower than *Amalgamated Food Employees Union* v. *Logan Valley Plaza*, 391 U. S. 308 (1968). It does not purport to interpret the National Labor Relations Act (NLRA) so as to give union members the same comprehensive rights to free expression on the private property of an employer that the First Amendment gives to all citizens on private property that is the functional equivalent of a public business district. But *Babcock* is, in another sense, even broader than *Logan Valley*. It holds that where a union has no other means at its disposal to communicate with employees other than to use the employer's property, or where the union is denied the access to employees that the employer gives antiunion forces, the union may communicate with employees on the property of the employer. Congress gave unions this right in Section 7

of the NLRA, 61 Stat. 140, 29 U. S. C. § 157. The First Amendment gives no such broad right to use private property to ordinary citizens.

The National Labor Relations Board found that petitioner permitted antiunion solicitation on its premises at the same time that it barred union solicitation. 181 N. L. R. B. 491 (1970). It made no explicit finding as to whether access to the employees was reasonably available to the union outside of the petitioner's property, but suggested that it was not. Rather than deciding the case under *Babcock, supra,* which would appear to control and to provide that the union activity in the case is protected by the NLRA, the Board appears to have decided the case under *Logan Valley, supra.* The United States Court of Appeals for the Eighth Circuit affirmed on the basis of *Logan Valley* and found it unnecessary to review the Board's finding of discrimination by the employer against the union in the use of its property or to remand the case for a determination of whether it was necessary for the union to use petitioner's property to communicate with the employees. 439 F. 2d 1321 (1971).

It is obvious, then, that neither the Board nor the Court of Appeals has fully considered whether the employer's conduct was proscribed by *Babcock* even though the indications in the Board's opinion are that it was. In reaching out to decide this case under *Logan Valley,* the agency and the lower court decided a difficult constitutional issue that might well have been avoided by deciding the case under the NLRA. This was error. The principle is well established that decisions on constitutional questions should not be reached unnecessarily. See, *e. g., Dandridge* v. *Williams,* 397 U. S. 471, 476 (1970); *Rosenberg* v. *Fleuti,* 374 U. S. 449 (1963).

550

Since both the agency and the Court of Appeals should have first decided whether or not *Babcock* controlled the instant case before proceeding to decide it under *Logan Valley,* before this Court decides whether or not the decision below was correct under the Constitution, we should remand the case to the Board, rather than to the Court of Appeals, for a square holding as to the applicability of *Babcock* to the facts of this case. MR. JUSTICE WHITE has recently re-emphasized the point that when an agency decides a case under an incorrect legal approach, courts should not seek to predict whether the agency would have decided the case the same way under the correct approach, but should instead remand the case to the agency for further proceedings. *FTC* v. *Sperry & Hutchinson Co.,* 405 U. S. 233, 249 (1972). See also *Burlington Truck Lines* v. *United States,* 371 U. S. 156, 168 (1962).

Accordingly, I would remand this case to the Board for further proceedings without deciding the constitutional question.