**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SIOUX CITY AND NEW ORLEANS BARGE LINES, INC., Respondent.**

**No. 72–1059.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 14, 1972.

Decided Feb. 2, 1973.

Elliott Moore, Atty., N. L. R. B., Washington, D. C., for petitioner.

Paul S. Kuelthau, St. Louis, Mo., for respondent.

Before BRIGHT and STEPHENSON, Circuit Judges, and TALBOT SMITH, District Judge.*

BRIGHT, Circuit Judge.

The National Labor Relations Board determined that Sioux City and New Orleans Barge Lines, Inc., (the Company) had engaged in unfair labor practices in violation of § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), because the Company refused to allow union representatives access to its towboats to organize its

* Eastern District of Michigan, sitting by designation.

workers.[1] The Board's decision is reported at 78 LRRM 1580, 193 NLRB No. 55 (1971). The Board has applied to us for enforcement of its order. We decline to do so.

The record reveals that the Company operates a fleet of 14 boats, 13 of which are towboats used to push barges primarily on the Missouri and Mississippi Rivers, but also on the Illinois, the Tennessee, and the Ohio Rivers. Generally these boats are dispersed over a large territory, including the area between Sioux City, Iowa, and New Orleans, Louisiana, and engage in continuous operation except for infrequent and brief lock or fuel stops. The crews on the towboats work shifts lasting from 30 to 60 consecutive days and accrue one day vacation for each day worked. They thus spend extensive time away from the boats when they take their vacations, usually during the slack winter season. Crew members, generally six persons, work on a six hours on—six hours off schedule and each serves two watches per day. When off watch, they may go to the bedrooms, the dining room, or, on some boats, the lounge area. Crew members board and leave the boats either in midstream (by means of tugboats, fuel flats, and grocery boats) or at ports.

In September 1970, the National Maritime Union (NMU) filed a petition for a Board election among deckhands, oilers, steersmen, mates, and cooks working on the Company's vessels. On September 17th, NMU and two intervening unions, Marine Officers Association (MOA), and Inland Boatmen's Union (IBU), joined with the Company in a stipulation for certification upon a consent election. The stipulation provided that the election was to be held between October 13th and 19th, 1970, at various ports on inland waterways. Off-duty employees could vote by mail.

On September 18, IBU made a written request to be allowed to board the towboats to have access to employees. A second written request was made on September 23. The Company replied to both letters but refused the boarding request because of alleged "undue and * * * unreasonable interference with our operations." However, the Company supplied the union with the names and addresses of crew members and the dates and places on which each would board or leave the boats. It also suggested that IBU coordinate its request for access to employees with the two other competing unions. IBU responded that it could use its own boats to board the towboats in midstream, but it declined to coordinate its request for "boarding privileges" with the other unions.

On September 29, MOA requested permission to board the boats at locks or fuel docks or during harbor operations. MOA stated that it would talk only with off-duty employees, would provide liability insurance, and would hold the Company harmless if any injuries were sustained. The Company refused MOA permission to board on the grounds that it had denied same to IBU and NMU and asserted that to do otherwise would be an unfair labor practice.

When IBU received the eligibility list from the Company on September 25th, it used 10 organizers in its attempt to contact the employees. Since the crew members live in 15 different states, the union initially attempted to contact them by long distance phone calls. When this proved unsuccessful, union representatives managed to locate three of the Company's boats by using a speedboat. They then threw literature to whoever was on deck. Attempts to carry on conversations with crew members on deck did not prove successful. Next, IBU organizers attempted individual home visits but they frequently were told that

1. The trial examiner conducted a hearing on a consolidated complaint which alleged unfair labor practices and interference with the election. Due to its finding of unfair labor practices, the Board entered a cease and desist order as well as an order setting aside the election.

crew members were either not at home or were still on the river, even though Company lists indicated that the particular employee was off the Company's boat. IBU succeeded in meeting face-to-face with 35 of 118 employees. IBU also sent two mailings to employees' homes.

NMU and MOA confined their pre-election campaign efforts to mailing literature to crew members on the boats and at their homes.

The results of the election showed 11 ballots for NMU, 17 for IBU, 17 for MOA, and 56 for no union, with five ballots challenged.

The trial examiner, in ruling that the Company must permit nonemployee union organizers access to its working towboats, relied upon language of the Supreme Court in NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 113, 76 S.Ct. 679, 685, 100 L.Ed. 975 (1955):

> * * * The right of self-organization depends in some measure on the ability of employees to learn the advantages of self-organization from others. Consequently, if the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them, the employer must allow the union to approach his employees on his property.

The trial examiner specifically found that denial of access to the towboats for nonemployee union organizers constituted an unfair labor practice since "no adequate means existed for direct communication between the Respondent's employees and the Union's organizers." Additionally, the trial examiner determined that requiring the Company to permit access would not result in any "substantial interference with or detriment to the Respondent's shipping operations." The Board approved these determinations.

We recognize that great practical difficulties faced the unions in attempting personal contact with employees at places other than at work. These em-

ployees lived at 118 residences scattered across 15 states, and they boarded and left the towboats at irregular times and places. But, the Board's order directing access to the towboats cannot stand under the circumstances presented here.

█ This case presents a situation where the right of union organizers to discuss organization with employees comes into direct conflict with the right of the employer to conduct its operations free from interference by nonemployee organizers. The National Labor Relations Act gives the Board the responsibility of accommodating the conflict between the employer's property rights and the workers' organizational rights. Central Hardware Co. v. NLRB, 407 U.S. 539, 543, 92 S.Ct. 2238, 2241, 33 L.Ed.2d 122 (1972); Babcock & Wilcox Co., *supra*, 351 U.S. at 112, 76 S.Ct. 679, 100 L.Ed. 975.

█ In reaching its decision in the present case, the Board reasoned that access as demanded by the unions would result in no substantial interference with the operation of the business, and, therefore, the employer's property rights must yield to the workers' organizational rights. Although the Board utilized an appropriate standard, its finding of no interference or detriment to shipping operations stands unsupported by substantial evidence in the record as a whole.

The record discloses that the towboats travel almost continuously at speeds as high as 17 miles per hour. They are individual working units containing hazardous machinery capable of producing serious injury. Although strangers are occasionally permitted on the boats, they are generally accompanied by a company employee. Presumably, similar arrangements would be necessary to protect and control a union representative.

To arrange contact between union organizers and employees on each of the 14 boats, the Company would be required to transmit specific information to the unions as to the location of the towboats and to advise the captains of

visiting arrangements. Since three unions are competing for the votes of the employees, making suitable and fair arrangements would call for the expenditure of substantial time and energy in coordinating visitations to the crew. Thus, the implementation of the Board's order would require the employer: (1) to expend additional time and efforts to aid union representatives in hazardous boarding and disembarking operations while the boats are on the run, or to substantially interfere with continuous operations by stopping the towboats; (2) to coordinate visits from union personnel from three unions by advising union officials of the location of the vessels and by communicating with boat captains advising and authorizing each visitation; (3) to assume, through its captains or supervising personnel, the duty of directing or taking union organizers to an appropriate place on board for meeting crewmen not on watch; and (4) to supply personnel to enforce reasonable rules and regulations so that, while on board, union organizers do not interfere with the work of on-duty crewmen. Thus, permitting three unions to have access to an employer's property under the circumstances of this case imposes a substantial burden both on the employer's property rights and on his production.

In Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803–804 n. 10, 65 S.Ct. 982, 988, 89 L.Ed. 1372 (1945), the Court recognized that an employer might prohibit an employee from soliciting union support from his co-workers on plant property during nonworking hours if "special circumstances make the rule necessary in order to maintain production or discipline."

In *Babcock & Wilcox Co., supra,* 351 U.S. at 113, 76 S.Ct. at 685, the Court reiterated that "No restriction may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline." The Court also indicated that the rights of nonemployee organizers were more limited than those of employee organizers. *Id.* Thus it is logical to conclude that if an employer, in order to maintain production or discipline, may prohibit or restrict *employee* organizational rights, it may also prohibit *nonemployee* organizational efforts on its premises when it can demonstrate substantial interference with its production and operations, as is the case here.

In denying the Board's order for access, we do not hold that the Board in all cases lacks the power to order access where such access may cause interference with production. But before such an order would be appropriate, the union must make a very strong showing of its inability to contact the employees. We need not explore that question in the posture of this case because here IBU was able to successfully contact many employees; it succeeded in meeting face-to-face with 35 of the 118 employees between September 25 and the election date of October 13, 1970. The short period of time utilized for the campaign undoubtedly limited the union's ability to contact other employees on off-duty status, but the record shows that with extra effort the union could achieve personal meetings with employees without boarding the towboats.

Accordingly, we deny enforcement of the Board's order.