**CAN–TEX INDUSTRIES, A Division of Harsco Corporation, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–1730.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1982.

Decided July 21, 1982.

House, Holmes & Jewell, P. A., Little Rock, Ark., Russell Gunter, Little Rock, Ark., for petitioner.

William Wachter, Elaine Patrick, Attys., N. L. R. B., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Before LAY, Chief Judge, and ROSS and ARNOLD, Circuit Judges.

ARNOLD, Circuit Judge.

This case comes to us on petition of Can-Tex Industries for review of an order of the National Labor Relations Board, and on cross-application for enforcement by the Board. An administrative law judge found Can-Tex to have violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), when it discharged 13 employees who took part in an unauthorized shutdown of Can-Tex's pipe-manufacturing plant—conduct the ALJ considered to be protected concerted activity within the meaning of the Act. The Board on June 23, 1981, adopted the findings and order of the ALJ. Can-Tex now seeks our review, contending that the Board's findings are not adequately supported by the record.[1] We agree and deny enforcement of the challenged portion of the Board's order.

---

1. Can-Tex does not challenge the Board's other findings and holdings that: the company violated Section 8(a)(1) of the Act by threatening employees with discharge and less desirable working conditions because of their participation in union or other protected concerted activities, by promising better or increased benefits or terms and conditions of employment in order to dissuade employees from selecting a union or engaging in other protected concerted activity, by soliciting grievances and impliedly promising to remedy them in order to dissuade employees from selecting a union or engaging in other protected concerted activities, by coercively interrogating employees about their own and their fellow employees' union activities and sentiments and protected concerted activities, by maintaining a rule which prohibited employees from engaging in union solicitation during their non-working time and which prohibited employees from distributing union literature during their non-working time in non-working areas of the plant, and by discharging employee Billy Jester for engaging in protected concerted activity. In all these respects, the order of the Board is enforced.

## I.

Can-Tex purchased its pipe-manufacturing plant in Magnolia, Arkansas, from Robintech Incorporated, which in turn had purchased the facility from Amoco the previous year. Can-Tex retained Robintech's employees and management and also adopted its employment policies and practices. All parties agree that there was considerable discontent among the plant workers under each of the owners.

The plant itself is organized around four departments: production, grinding, shipping and receiving, and maintenance. The production department is the core of the plant's operations. There, eight extruding machines pump a polyvinyl chloride compound (PVC) through a die system to form plastic pipe. Then a saw automatically cuts the pipe into desired lengths.

The extruding machines, once started, run continuously—24 hours a day, seven days a week, 365 days a year. This process can be sustained with only minor adjustments and maintenance of the machines, along with periodic removal of the pipe, which collects in racks after being cut. To maintain round-the-clock operations there are 45 to 48 production-department employees, divided into four shifts. Only three shifts are scheduled to work on any given day. Keeping the eight extruders running appears to be a relatively simple task that requires a minimum of two operators per shift. Starting and stopping the machines, however, is more complicated. It takes two or three employees from one to 24 hours to re-start an extruder, depending on the type of machine. And when the machines are turned off it is critical that a purging compound be introduced to prevent damage.

The discontent among the employees had several bases. One involved Can-Tex's policy on holidays and vacations. Shortly before Amoco sold the plant to Robintech, it increased vacations and granted an additional paid holiday. Robintech retracted the new benefits and eliminated an additional paid holiday. When Can-Tex took over, it retained Robintech's schedule on holidays and vacations. There were also complaints that the pay scale was too "slow"—the time between pay increases was too long—and that Can-Tex failed to fill new positions from within the plant work force. Finally the employees perceived a general lack of interest in their complaints on the part of the management and a failure to take them seriously. As a result there was often talk of "shutting down" the plant to bring attention to the situation.

During July, August, and September of 1979, several production employees discussed their grievances among themselves, and further discussed the possibilities of a plant shutdown and unionization. One of the leaders of this group, Billy Jester, was fired by Can-Tex on September 6. The stated reason for his dismissal was insubordination. Other employees suspected he was fired because of his involvement in protected concerted activities.[2] After Jester's discharge the production employees decided to follow through with their plans to shut down the plant. On September 10, around midnight, several employees (12 to 13) from the other three shifts entered the plant and, with the help of employees on the "graveyard shift," turned off the extruding machines.

As the machines were being turned off, two operators came into their supervisor's office, told him they had nothing against him personally, but that they were shutting down the plant. The supervisor, John Holly, told them he thought they were doing the wrong thing, but at that point it was too late, because the machines were already being switched to the "off" position. Holly then went into the work area and supervised the purging of the machines. Once a machine is turned off, it must be purged immediately to avoid damage. The men willingly helped Holly purge the machines.

After the purging process was complete, Holly contacted Scott Dickson, the Plant

---

2. As much was found by the Board, and in a portion of the Board's order not questioned here by Can-Tex, it found the discharge of Jester to be a violation of Section 8(a)(1).

Engineer, and Fred Bradley, the Plant Manager. Upon their arrival at the plant the three, Holly, Dickson, and Bradley, met with a group made up of a spokesman representing each of the four shifts. The workers spoke briefly with the managers and presented a list of grievances. At the close of the meeting Holly asked if they would be willing to restart the machines and give the management some time to get someone from the company to come talk to them. One of the four was willing, but the other three were not, so Bradley told everyone to go home.

The next day Bradley notified Can-Tex's main office of the shutdown. Then two vice-presidents flew to Magnolia where they met with Dickson, Bradley, and all the supervisors. It was decided that all employees who, without coercion, actually participated in turning off machines would be discharged. Those who may have supported the action, but were not physically involved, were not to be disciplined.

The company had first-hand knowledge that both operators on Holly's shift and the four employees in the meeting had participated in turning off machines. Notices of their discharge were posted immediately. Other workers were interviewed, and those admitting their participation were fired. Those interviewed were told that the company would take their word as to whether their participation was a result of coercion and as to whether they were involved at all. According to one employee's testimony, there were some who were not disciplined who took part in turning off the machines but denied it. As a result of the unauthorized shutdown Can-Tex lost two days' production.

## II.

We are mindful of our limited role in reviewing factual findings made by the Board. Such findings must be accepted if they are supported by substantial evidence on the record as a whole, *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and we may not substitute our own inferences for those of the Board. How we would have found the facts if we had heard the evidence is irrelevant.

■ Cessation of work for the purpose of presenting grievances is unquestionably protected concerted activity. *National Labor Relations Board v. Washington Aluminum Co.*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). The employees' conduct here— turning off Can-Tex's equipment—went beyond the mere cessation of work. The issue, then, is whether the turning off of the equipment was unprotected conduct and thus a valid basis for discharge.[3] The ALJ found that there was a "danger of foreseeable imminent damage to [Can-Tex's] equipment had the employees simply walked off and left the equipment running." Appendix at 37. The ALJ also credited testimony of one of the operators, Norman Biddle, "to the effect that the employees turned the machinery off so as to avoid damage to the equipment." *Id.* at 37 n.25. On the basis of these findings the ALJ concluded that turning off the equipment was protected concerted activity.

We have diligently searched the record and can find little or no evidence to support these findings. From all indications the extruding machines were able to run for up to two weeks with a minimum of attention. Scott Dickson, a supervisor, testified that in most cases nothing would happen if one walked off and left the machines running. Tr. 155. The only potential problem was a hang-up in the saw that could occur if there was no one to unload the pipe rack as it became full. Dickson further testified that this problem was likely to occur only when the extruder was producing large-diameter pipe. Tr. 156. Nowhere does the record reveal how many people were required to keep the rack from filling up, how long it

---

**3.** The Board did not base its order on a finding that the turning off of the equipment, though unprotected, was not the real reason for the discharge of the 13 employees in question. Any such theory is inconsistent with the ALJ's findings and was expressly disclaimed by counsel for the Board at the oral argument.

would take the rack to fill up, or what size pipe was being produced at the time. Though there may have been a *possibility* of damage to the equipment, we find no substantial evidence to support a finding of a "danger of foreseeable imminent damage" to the equipment.

Furthermore, the record makes clear that the employees' objective in turning off the machines was not to protect Can-Tex's equipment but to halt operations at the plant.[4] The strike was planned to occur at a time when management was minimally represented at the plant. Norman Biddle testified as follows:

Q. Your intent in shutting the plant down was to halt production of that plant, is that correct?

Biddle: Yes, it was.

Tr. 307. This testimony is in direct contradiction to the Board's finding that "Biddle credibly testified to the effect that the employees turned the machinery off so as to avoid damage to the equipment." Appendix p. 37 n.25. Certainly the machines were "purged" to prevent damage, and there was testimony to that effect; but purging becomes necessary only when the machines are switched off. Biddle's testimony makes clear that the machines were turned off with the intent of halting production, not to protect the equipment.

The employees intended, of course, to make the company suffer economically in order to bring attention to their grievances. This is often a lawful motive so far as the withholding of labor is concerned; indeed, that is the purpose of most strikes. Under the National Labor Relations Act, however, "the task of the Board, subject to review by the courts, is to resolve conflicts between . . . rights [of employees granted by the Act] and private property rights, 'and to seek a proper accommodation between the two.'" *Hudgens v. National Labor Relations Board*, 424 U.S. 507, 521, 96 S.Ct. 1029, 1037, 47 L.Ed.2d 196 (1976), quoting *Central*

*Hardware Co. v. National Labor Relations Board*, 407 U.S. 539, 543, 92 S.Ct. 2238, 2241, 33 L.Ed.2d 122 (1972). The rights of the employees and the employer's property rights must be balanced "with as little destruction of one as is consistent with maintenance of the other." *National Labor Relations Board v. Babcock & Wilcox Co.*, 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956). Here the employees did more than merely stop work. They affirmatively interfered with the company's property, and there is insufficient evidence to justify the ALJ's finding that the interference was necessary to avoid imminent damage to the property. This is not a case where the Board held as a matter of law that interference with company property, though unrelated to the avoidance of damage, was nevertheless legally justified on balance. We express no view on the lawfulness of such a possible theory.

Can-Tex argues that the unauthorized shutdown was a usurpation of its option of continuing production. On this record, we agree. The employees' conduct is similar to that ruled unprotected by the Board in *Mal Landfill Corp.*, 210 NLRB 167 (1974). In that case several employees closed the gates of the landfill, effectively shutting down operations, to protest unsafe working conditions at the site. Although the gates were closed only for 20 minutes, the Board found no unfair labor practices by the company "which would justify on balance misconduct by such employees in furtherance of a desire to engage in concerted activities." *Id.* at 172. The Board concluded that the employees' action was "serious misconduct" for which they could be lawfully discharged. *Ibid.* Similarly, the employees' actions in the case at bar went beyond a work stoppage and had an "appreciable impact on company production," *Crenlo, Division of GF Business Equip., Inc. v. National Labor Relations Board*, 529 F.2d 201, 204 (8th Cir.

4. A different situation would be presented had the Board found a "perceived danger" on the part of the employees. If the employees believed reasonably, or even simply in good faith, that there was a threat of harm to company equipment, we would be inclined to consider the turning off of the equipment protected, even where the threat was ultimately found to be absent.

1975) (per curiam), and thus the Board's order that the 13 employees must be reinstated cannot stand.

Enforcement is denied as to that portion of the Board's order that held unlawful the discharge of the 13 employees in question. In all other respects the order of the Board is enforced.

It is so ordered.