CITY OF CLEVELAND, Appellee,

v.

BREGAR, Appellant.*

[Cite as *Cleveland v. Bregar* (1995), 106 Ohio App.3d 713.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 67999.

Decided Oct. 10, 1995.

* Reporter's Note: A discretionary appeal to the Supreme Court of Ohio was not allowed in (1996), 75 Ohio St.3d 1405, 661 N.E.2d 755.

*Carolyn W. Allen,* Chief Prosecuting Attorney, City of Cleveland, and *Gina M. Villa,* Assistant City Prosecutor, for appellee.

*Levin & Levin* and *James A. Levin;* and *Raymond Vasvari,* for appellant.

JAMES D. SWEENEY, Judge.

Defendant-appellant William Bregar appeals from his plea of no contest to a charge of criminal trespass in violation of Cleveland Codified Ordinances 623.04(a).[1] For the reasons adduced below, we affirm.

Prior to the scheduled Cleveland Indians baseball game on the evening of August 2, 1994, Bregar took a hand-lettered sign measuring approximately four feet by five feet upon which was written "A FIELD OF GREED" and stood outside Gate A of Jacobs Field baseball stadium, which is part of the sports complex in downtown Cleveland owned by Gateway Economic Development Corporation of Greater Cleveland ("Gateway"). Gateway is a nonprofit corporation created by private individuals and organized pursuant to R.C. 307.696(A)(2) to construct and operate the sports complex for the city of Cleveland. Private

---

1. This section provides:

 "(a) No person, without privilege to do so, shall do any of the following:

 "(1) Knowingly enter or remain on the land or premises of another;

 "(2) Knowingly enter or remain upon the premises of another, the use of which is lawfully restricted to certain persons, purposes, modes or hours, when the offender knows he is in violation of any restriction or is reckless in that regard;

 "* * *

 "(4) Being on the land or premises of another, negligently fail or refuse to leave upon being notified to do so by the owner or occupant, or the agent or servant of either[.]"

stadium security personnel notified Commander Sade, who was employed by Gateway on a part-time basis and supervised the off-duty Cleveland Police officers working as part-time security guards at Gateway events, of Bregar's location. Commander Sade informed Bregar that his presence at Gate A was obstructing the flow of the pedestrians and escorted Bregar from the Gate A area to a sidewalk location on the Ontario Street [2] side of the Gateway complex, where Bregar could stand with his sign without objection from Gateway Security.

Bregar returned with his sign to the sidewalk location on Ontario street on the night of August 3, 1994, prior to the baseball game that evening, and received no complaints from security.

On the evening of August 4, 1994, a date which will live in infamy as being the last day of the strike-shortened 1994 major league baseball season, Bregar returned to Jacobs Field approximately one hour before game-time without a ticket for the game and stood with his sign at a location on a sidewalk, just east of a line of planted trees which run down the middle of the sidewalk along Ontario Street,[3] adjacent to Gund Arena (which is home to the Cleveland Cavaliers basketball team and is also part of the Gateway sports complex) on Ontario Street where that street and a paved access road leading into the Gateway complex intersect at the southwest corner of Gund Arena.[4] Commander Sade noticed that Bregar was located on Gateway private property and was impeding the massive flow of pedestrians, who were forced to walk into the curb lane of Ontario Street in order to avoid Bregar and his sign. Bregar was also being buffeted by the flow of pedestrians, who were elbow-to-elbow. Commander Sade asked Bregar to move approximately eight feet to one side, toward Ontario Street and west of the line of trees [5] (toward non-Gateway property) onto a less used portion of the sidewalk adjoining Ontario Street, in order to alleviate the perceived hazard to the pedestrians who were streaming into the baseball stadium while allowing Bregar to fully display his sign. Bregar refused to move.

---

2. Ontario Street is a heavily travelled four-to-eight-lane north-south thoroughfare which runs through the very heart of downtown Cleveland, past the Gateway complex, connecting the downtown business district with Interstate 90, which is located just south of the Gateway complex.

3. The sidewalk running along Ontario Street is approximately eight to twelve feet wide on each side of the tree-planted area. Thus, when one subtracts the width of the appellant's sign from the total width of available sidewalk east of the tree-planted area, one is left with passing room of approximately several feet on each side of the sign. The bottleneck in pedestrian capacity crowd traffic at that point is obvious.

4. The game that night was a sellout, which amounts to approximately 42,000 fans.

5. The middle of the line of trees running roughly the length of the sidewalk is the approximate dividing line separating Gateway private property from public property.

Commander Sade informed Bregar about the law concerning criminal trespass and the Gateway policy which prohibits anyone from distributing pamphlets, selling tickets, or doing anything to jeopardize fan safety by impeding traffic flow, but Bregar still refused to move. Bregar produced a small tape recorder and proceeded to record the event. Commander Sade made several more requests for Bregar to move a few feet to improve pedestrian safety, but Bregar rebuffed these requests as well. At that point, Bregar was arrested and charged with criminal trespass under the city's ordinance.[6]

On August 22, 1994, the first pretrial conference was conducted. At this pretrial, Bregar gave to the plaintiff-appellee city of Cleveland a copy of a motion to dismiss, the original of which had been filed just before the start of the conference. The trial court continued the conference until September 29, 1994, to allow the city to submit an opposition brief to the motion to dismiss.

The city filed its brief in opposition to dismissal on September 21, 1994.

Immediately prior to the start of the scheduled September 29, 1994 hearing on the motion to dismiss, Bregar filed a supplemental memorandum of law in support of his motion to dismiss, arguing that he was arrested while standing on a public sidewalk, which is allegedly a public forum for First Amendment purposes by virtue of the substantial contacts between Gateway, the city and Cuyahoga County. Appellant conceded at the trial court level that Gateway holds title to that area of the sidewalk where he was arrested. The court conducted the hearing on that date and denied the motion to dismiss. At this point, Bregar changed his earlier plea of not guilty to one of no contest. Bregar was then convicted of criminal trespass under the city's ordinance. Bregar was sentenced to a fine of $100 plus court costs, thirty days' imprisonment (which were ordered suspended), and one year of inactive probation. Execution of sentence was stayed pending appeal.

This appeal from the adverse ruling on the motion to dismiss presents two assignments of error which will be discussed jointly.

## I

"The Cleveland Municipal Court erred in denying appellant's motion to dismiss because the city failed to adduce sufficient evidence to establish that the sidewalk

---

6. At an earlier point before this game, Commander Sade confronted another fan on Gateway property, who was carrying a twelve-foot replica of Chief Wahoo, the Cleveland Indians mascot, displaying a message concerning the impending baseball strike. Commander Sade informed him that the display was impeding the flow of pedestrians. The fan was permitted to place the sign in an upright position against a wall of Jacobs Field, and after getting a ticket for the game, was allowed to take the sign into the stadium where it was put up and displayed to the public without objection by stadium security.

on which the appellant was arrested should be treated as private property for purposes of First Amendment analysis."

■ In this assignment, appellant argues that the Gateway property on which he was arrested, although privately held by Gateway, should be considered as public property for purposes of a First Amendment analysis. Appellant bases this public property distinction upon his belief that Gateway, as it was formed and is constituted and managed, should be considered a governmental actor by virtue of Gateway's ties to the governments of the city of Cleveland and Cuyahoga County. If that property was public, he argues, he was then privileged to be on Gateway property, thereby obviating one of the necessary elements for a conviction of the municipal offense of criminal trespass. In order to resolve this issue, a retrospective of the birth of Gateway is in order. Fortunately, this retrospective, which was relied upon by the appellee herein at the trial court level, was provided by Judge Aldrich in *N. Ohio Chapter of Associated Builders & Contrs., Inc. v. Gateway Economic Dev. Corp. of Greater Cleveland* (N.D.Ohio 1992), No. 1:92–CV–0649, unreported, 1992 WL 119375 (the trial court ruled that Gateway was a private entity for purposes of the Fourteenth Amendment and application of alleged federal law violations), a copy of which is attached to the appellant's brief.

In *Associated Builders,* the court stated the following at 3–8:

"FACTS

"A. *The Emergence and Role of Gateway*

"In 1986, the City of Cleveland ('City') joined forces with the Greater Cleveland New Stadium Corporation ('GCNSC') in order to acquire and assemble real property for a site upon which a new sports complex could be constructed. Because of spreading blight in an area of the City known as the Central Market district, the City agreed to 'undertake the public actions necessary to acquire the property interests' in the Central Market district and sell them to the GCNSC. Cleveland City Ord. No. 2581–90 (Oct. 29, 1990). In return, the GCNSC agreed to buy the blighted properties acquired by the City and also to buy other properties in the area in order to assemble a site large enough for the planned sports complex. The proposed sports complex was to include a baseball stadium, basketball arena, and parking garages, and was meant to serve as the new home for one or more local professional athletic teams.

"By 1990 most of the land had been assembled. Also by 1990, the GCNSC had announced that it would merge with Gateway and that Gateway would be the surviving entity. Gateway itself had been formed as an Ohio non-profit corporation, pursuant to Ohio Revised Code § 1702.01 *et seq.* In addition, Gateway had been formed in contemplation of O.R.C. § 307.696 ('the Enabling Act'), which,

among other things, provides that an Ohio non-profit corporation may be formed specifically for the purpose of constructing and/or operating a sports complex. The Enabling Act also provides that certain public financing arrangements for the sports complex may be undertaken if an agreement is reached between the non-profit corporation, the board of county commissioners for the county in which the sports complex is to be built, and the municipal corporation in which the sports complex is to be built.

"Thus, on October 29, 1990, in order to facilitate the construction of the sports complex, the City of Cleveland passed Ordinance No. 2581.90. This ordinance authorized the Mayor of the City to enter into an agreement with Gateway and with the Cuyahoga County Board of Commissioners ('the County') relating to the financing, construction, ownership, and operation of the sports complex. The ordinance also set out provisions so that the City's agreement with Gateway could be structured to allow for the public financing arrangements contemplated in the Enabling Act. Similarly, on November 5, 1990, the County passed Resolution No. 904626, which approved the County's entry into an agreement with the City and with Gateway for the building and financing of the sports complex and to allow the public financing arrangements contemplated in the Enabling Act.

"Accordingly, on November 7, 1990, Gateway, the City, and the County entered into an agreement ('the Tripartite Agreement') to pursue the financing, construction, ownership, and operation of the sports complex. The Tripartite Agreement provides that Gateway will be the builder, owner, and operator of the sports complex itself, and that Gateway is authorized to enter into any leases necessary to operate the sports complex. The City agreed to do whatever might be necessary to allow Gateway to succeed to the rights of GCNSC, so that Gateway will also own the real property upon which the sports complex is built. Any land that is 'left over' after the sports complex is built, however, may be purchased by the City at the City's option.

"Concerning construction, the three parties agreed that Gateway must file construction plans for review and approval by the City and County, and must notify the City and County if the construction plans are changed.

"As to financing, Gateway is to issue bonds on behalf of the City in an aggregate principal amount not to exceed $200 million to finance construction of the sports complex. The County, having obtained approval from the electorate, levied a tax and pledged the revenue to secure the bonds, as well as to pay half of less of the costs [sic] of building the sports complex. Once the bonds are paid off, Gateway must convey ownership of the sports complex to the City, and the City must in turn convey the sports complex to the County if a favorable ruling is obtained from the Internal Revenue Service.

"In addition to the provisions of the Tripartite Agreement concerning the financing, construction, ownership, and operation of the sports complex, the Tripartite Agreement also states that Gateway must follow its own Code of Regulations ('Code'). The Code, which is attached to the Tripartite Agreement as an exhibit, lies at the center of this case. The reason that this case turns upon the provisions of the Code is that the Code clearly provides the City and the County with some level of control over Gateway itself. The crucial question is whether the City and the County control Gateway to such an extent that Gateway is not an independent entity, but rather an arm of local government.

"B. *The Provisions of Gateway's Code*

"Gateway's Code states that the initial Gateway Board of Trustees ('Board') will consist of nine members, each of whom is to serve for seven years. The initial Board members are appointed by the County and the City: the County appoints four members, the City appoints four members, and the two political bodies appoint the last member jointly. Also, both the City and County designate one of the four members that it appoints as its 'ex officio' member. The two ex officio Board members are voting members and represent the interests of the City or County, respectively, in addition to pursuing the interests of Gateway.

"If a Board member position becomes vacant through retirement, removal, or for any other reason, the vacancy is to be filled by the entity that made the initial appointment. After the initial Board members have served their seven year terms, new members are appointed to terms of varying lengths. Again, four members are to be appointed by the City, four by the County, and one by the City and County jointly, and one of the four appointed by each political body is to be an ex officio member.

"Board members are subject to removal by either a two-thirds vote of the full membership of the Board, or by unilateral action of the appointing body. Reasons for removal, however, are limited to: '(a) conduct detrimental to the interests of [Gateway], *i.e.*, for any act or omission undertaken with the deliberate intent to cause injury to [Gateway], or (b) for refusal to render reasonable assistance in carrying out [Gateway's] purposes.' Code at 7–8. The Code provides that any provision of the Code itself may be amended or repealed by a majority of the Board, except that material changes to the provisions concerning appointment and removal of Board members may only be made with the approval of the City and County.

"The Code further states that the Board is responsible for the management and control of Gateway's business and property, and that all Board meetings are

open to the public. Private meetings may be held on specified subjects, however, such as arranging Gateway security, preparing for public biddings, formulating strategy for court action, and compensating or disciplining employees. The Board elects Gateway's officers, who may then be removed only by a two-thirds vote of the Board. The Board may also confer upon various agents the power to act on behalf of Gateway, including appointment of an Executive Director 'who shall be responsible for the day to day operations of [Gateway].' Code at 18. The Chairman of the Board may appoint advisory committees as he sees fit, but must at least appoint these five advisory committees: the Design and Construction Committee; the Personnel Committee; the Development Committee; the Marketing/Public Relations Committee; and the Finance Committee.

"Finally, the Code states that Gateway's employees are not public employees— they are not covered by civil service and do not participate in any public employee retirement plan."

In *Cincinnati v. Thompson* (1994), 96 Ohio App.3d 7, 17, 643 N.E.2d 1157, 1164, the court stated the following:

"Property does not, however, 'lose its private character merely because the public is generally invited to use it for designated purposes.' *Lloyd Corp. v. Tanner* (1972), 407 U.S. 551, 569, 92 S.Ct. 2219, 2229, 33 L.Ed.2d 131, 143. A private property owner cannot be subjected to the First and Fourteenth Amendment rights of others unless the 'property * * * assume[s] to some significant degree the functional attributes of public property devoted to public use.' *Cent. Hardware Co. v. NLRB* (1972), 407 U.S. 539, 547, 92 S.Ct. 2238, 2243, 33 L.Ed.2d 122, 128 * * *." See, also, *Marsh v. Alabama* (1946), 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265.

Appellant relies on the recent case of *Lebron v. Natl. RR. Passenger Corp.* (1995), 513 U.S. ——, 115 S.Ct. 961, 130 L.Ed.2d 902, to support his argument that Gateway's ties to the local government are so substantial as to render Gateway a government actor for his individual First Amendment purposes. In *Lebron*, plaintiff's billboard, which contained a political statement, was rejected by Amtrak for display inside an Amtrak station due to the content of the message. The court determined that the National Railroad Passenger Corporation, a.k.a. Amtrak, was a government agency for purposes of individual rights guaranteed against the government by the Constitution because (1) the government mandated the creation of the corporation by a special law (the Rail Passenger Service Act of 1970); (2) the corporation was created to specifically further stated government objectives (to avert the threatened extinction of passenger rail service in the United States); and (3) the government retained for

itself under the creating statute the permanent authority to appoint a majority of the corporation's directors.

At first blush, *Lebron* appears to be controlling. After reviewing the creation of Gateway and applying the facts of this case, we must conclude that *Lebron* is not controlling and that Gateway is not a government actor or agency for purposes of the First Amendment. The reason for this conclusion is that unlike Amtrak, whose creation was mandated by a special law, Gateway was formed pursuant to R.C. 307.696. This section, R.C. 307.696, was not a directive, but was instead an authorization permitting nonprofit corporations to be formed for the purpose of constructing and/or operating sports complexes. This distinction between mandating and authorizing was succinctly stated by Judge Aldrich in *Associated Builders, supra,* at 23–24:

"Whether a non-profit corporation is a political subdivision depends not on whether its formation is mandated or merely authorized; the difference is whether its formation is attributable to private, rather than governmental, action. When a state mandates the creation of an entity, that entity is fairly called a governmental actor. When a state *allows,* instead of *mandates,* a local government to create an entity, that entity, if formed, is still a government actor, since it was a local government that formed it. Only if an entity is *allowed* to be formed by a *private actor* is the entity a non-government actor.

" * * * The statute enabling Gateway, however, merely allows local governments to enter into agreements with private entities who may form or not, as they wish, in order to pursue a goal in tandem with that local government. '[Gateway's] contractual relations with * * * political subdivisions * * * do not transform [Gateway] itself into a political subdivision of the State.' *Truman Medical Center [v. NLRB* (C.A.8, 1981) ], 641 F.2d [570] at 572." (Emphasis *sic.*)

Additionally, while Gateway has taken on some attributes of a public entity, it lacks others, to wit:

"Gateway's employees are not regarded as governmental employees; Gateway does not have the power of eminent domain; Gateway does not have the power of subpoena; Gateway lacks the authority to issue tax-exempt bonds; and Gateway does not have the power to tax." *Associated Builders, supra,* at 23.

Based on the above, we conclude that the trial court determination that Gateway was a private entity was supported by sufficient evidence and by the weight of the evidence.

The first assignment is overruled.

## II

"The Cleveland Municipal Court erred in denying appellant's motion to dismiss because even if the Gateway Economic Development Corporation is not considered a state actor for purposes of First Amendment analysis, the sidewalk upon which the appellant was arrested should still be considered a public forum."

 This argument is premised on appellant's belief that the Gateway portion of the sidewalk is indistinguishable from the city-owned portion of the sidewalk, and that therefore he should have the same First Amendment protection for his speech on the Gateway portion of the sidewalk as on the nearby public portion of the sidewalk. This argument is unpersuasive in part.

 Appellant relies upon two federal cases, both of which involved free speech issues on unrestricted-use property owned by private entities, namely, the United States Postal Service and a high school. See *Jacobsen v. United States Postal Serv.* (C.A.9, 1993), 993 F.2d 649, and *Bacon v. Bradley–Bourbonnais High School Dist.* (C.D.Ill.1989), 707 F.Supp. 1005. It is true that the sidewalk location where appellant was arrested was Gateway private property and that its use by pedestrians was practically unrestricted, thereby allowing a demonstrator the exercise of free speech thereon. However, the exercise of that free speech is not completely unfettered in an area which is treated as a public forum for purposes of the First Amendment. *Planned Parenthood Assn. of Cincinnati v. Project Jericho* (1990), 52 Ohio St.3d 56, 556 N.E.2d 157; *Cleveland v. Sundermeier* (1989), 48 Ohio App.3d 204, 549 N.E.2d 561. The following was stated in *Planned Parenthood,* 52 Ohio St.3d at 59, 556 N.E.2d at 161:

"The First Amendment guarantees the right to publicly communicate views and to express dissension. Demonstrators may speak, march, picket, leaflet, carry signs or otherwise act to inform or persuade others of their beliefs. These rights, however, do not include the right to imperil public safety or to harass others in exercise of their rights. *United States v. Dickens* (C.A.3, 1982), 695 F.2d 765, 772, certiorari denied (1983), 460 U.S. 1092 [103 S.Ct. 1792, 76 L.Ed.2d 359]; *Galella v. Onassis* (S.D.N.Y.1972), 353 F.Supp. 196, 223, affirmed in part and reversed in part (C.A.2, 1973), 487 F.2d 986. ' * * * The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. * * * ' *Cox v. Louisiana* (1965), 379 U.S. 536, 554 [85 S.Ct. 453, 464, 13 L.Ed.2d 471, 484].

"The First Amendment does not preclude reasonable restrictions relating to time, place and manner of expression so long as they (1) are content-neutral, (2)

are tailored to serve a significant government interest, and (3) leave alternative channels of communication open."

In the present case, the evidence disclosed that appellant was imperiling the safety of the pedestrian traffic streaming toward the baseball field. Pedestrian safety is clearly a significant interest to the government and to entities operating a baseball stadium. Appellee's agents did not seek to censor appellant's message based on the content of the speech; they only requested that appellant move several feet to one side to improve pedestrian safety. This request to move several feet is a reasonable restraint under the circumstances. Also, appellant had alternate channels of communication open, namely, moving over several feet as requested (which would have alleviated the danger to other pedestrians while leaving his sign well within their sight) or purchasing a ticket to the game and taking the sign into the stadium.

■ Finally, appellant attempts to argue that the ordinance in question cannot be used as a restriction on the time, place, or manner of free expression because the ordinance gives unfettered *ad hoc* discretion to the arresting officers to grant or deny access to a public location solely by virtue of their ability to arrest a demonstrator upon the demonstrator's refusal to move. This argument overlooks the fact that the arresting officer's discretion is limited, under the facts of this case, to those situations involving persons who refuse to move *and* are creating safety hazards by virtue of their location.

The second assignment is overruled.

*Judgment affirmed.*

SPELLACY, P.J., and McMANAMON, J., concur.

ANN McMANAMON, J., retired, of the Eighth Appellate District, sitting by assignment.