FAIRFIELD COMMONS CONDOMINIUM
ASSOCIATION ET AL., APPELLEES, *v.*
STASA ET AL., APPELLANTS.

(No. L-85-013 — Decided November 29, 1985.)

*Thomas J. Sheperek* and *Michael B. Adams,* for appellees.

*John D. Garand* and *Mary M. Bollinger,* for appellants.

WILEY, J.   This cause is before the court on appeal from a judgment of the Lucas County Court of Common Pleas, wherein that court issued a permanent injunction enjoining appellants from picketing on the private property of appellees and also found appellants in contempt of court for violating prior restraining orders.[1]

On December 11, 1984, the trial court rendered the following judgment:

"NOW THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED, that the preliminary injunction be and it is hereby adopted and ordered permanent and in full force and effect.

"And it is further ordered that defendants are permanently enjoined from any activities in the vicinity of [the] private residence of plaintiff, Dr. Carl Armstrong, and ordered to confine their activities to the public sidewalk along the property wherein the plaintiffs' clinic is situated, and

"Each defendant is hereby fined Ten and 00/100 Dollars ($10.00) each, and the court sentences each defendant to one day in the county jail. However, the court suspends the jail sentence subject to strict compliance with the permanent injunction.

"Plaintiff is awarded judgment in the amount of Twenty-five Hundred and 00/100 Dollars ($2,500.00) against all defendants for attorney fees. Each defendant is assessed an equal amount of the judgment."

From that final judgment appellants filed a timely notice of appeal. Appellants assert the following six assignments of error:

"I.   The trial court erred in not ordering adequate discovery in a timely manner thereby preventing defendants from locating some potential witnesses and thoroughly preparing their defenses.

"A.   The trial court erred by not imposing sanctions, as provided in Ohio Rules of Civil Procedure 37(D) and 41(B), upon plaintiff who did not answer the interrogatories and did not timely file for a protective order.

"B.   The trial court erred by issuing a protective order prohibiting the disclosure of the names of the patients and by not ordering the plaintiff to produce the names of the employees present the date Marjorie Reed was on the property.

"II.   The trial court erred by admitting evidence and testimony which should have been excluded.

"A.   The trial court erred by ruling that plaintiff Dr. Carl Armstrong owned four units of Fairfield Commons, without insisting upon adherence to the 'Best Evidence Rule' relative to the production of a deed, or deeds to the property.

"B.   The trial court erred by ruling that plaintiff Dr. Carl Armstrong represented plaintiff Fairfield Commons Condominium Association.

"C.   The trial court erred by admitting testimony relative to dates of alleged trespasses of Marjorie Reed which were not included in plaintiff's answer to defendant's interrogatories, and its' [*sic*] different rulings on the same objection.

---

[1] The term "restraining orders" will collectively refer to both the temporary restraining orders and preliminary injunctions issued against appellants.

"D. The trial court erred by admitting exhibits without a proper foundation.

"III. The trial court's rulings result in the restraint of defendants' First Amendment rights.

"A. The trial court erred by ruling Fairfield Commons is a condominium office complex, and as such private property from which plaintiff's [sic] have a legal right to exclude defendants, and that 'the public sidewalk along Monroe Street is an adequate forum for defendant's [sic] to attempt to deliver their message and pursuade [sic] the public' and thus exercise their constitutional rights.

"B. The trial court erred in not finding that the Fairfield Commons Condominium is a part of a totally commercial area and therefore has acquired a public, or at least a quasi-public nature.

"C. The trial court erred by ruling that a permanent injunction should issue prohibiting picketing and protesting at plaintiff, Dr. Carl Armstrong's residence.

"IV. The trial court erred in making certain critical findings of fact that are against the manifest weight of the evidence.

"V. The trial court erred by bifurcating the trial and separation of the counterclaim of defendant Marjorie Reed.

"VI. Public policy dictates that necessity, in some circumstances, can excuse trespass or otherwise actionable conduct.

"A. The trial court erred in not finding that these defendants have a right to protect the rights and life of that unborn human being, as the defendants feel that their actions are necessary in that defense. Defendants' constitutional rights to Freedom of Speech are greater in weight, when exercised for the purposes of protecting the rights, and even the life, of unborn human beings, than in other endeavors.

"B. The trial court erred in not finding that, while, according to the U.S. Supreme Court, the unborn fetuses are not persons, they are human beings. Dr. Hillabrand offered uncontroverted testimony to that effect, which was given no consideration by the trial court. Medical science has pushed back the time that must elapse before the unborn fetus is considered to be viable.

"C. Public policy demands that the law be interpreted in such a manner that when invoked in the defense of another human being, defendants' First Amendment rights are fundamental rights, not to be infringed upon except for the a [sic] compelling reason."

The appellants are individuals who do not believe in abortion and are demonstrating this belief by picketing the appellees' property where abortions take place. The named appellants are as follows: John M. Stasa, Marygrove Catholics United For Life, John E. Gaski, Marjorie Ganzel, Joseph Ganzel, Antoinette Moriarity, Kathleen Moriarity, and Marjorie Reed. The appellees are the Fairfield Commons Condominium Association and Dr. Carl Armstrong. Dr. Armstrong owns condominium property which he rents to Toledo Medical Services, Inc., of which he is the sole shareholder. Toledo Medical Services conducts abortions within the condominium property and that is the reason for appellants' picketing on that property.

Appellees instituted this action by filing a complaint for an injunction and a motion for a temporary restraining order against appellants Stasa, Marygrove Catholics United For Life, Gaski, M. Ganzel, and J. Ganzel on August 11, 1983, to enjoin those individuals from picketing on the Fairfield Condominium property. The trial court granted the temporary restraining order on August 12, 1983, after a hearing on the motion. Appellees then amended their complaint on August 29, 1983, to include A. Mor-

iarity, K. Moriarity, and Reed as defendants. The trial court granted the motion for a temporary restraining order as to these latter three appellants on the same day. After extensions of the respective temporary restraining orders, preliminary injunctions were issued against appellants Stasa, Marygrove Catholics United For Life, Gaski, M. Ganzel and J. Ganzel on October 5, 1983 and against A. Moriarity, K. Moriarity, and Reed on December 7, 1983. On January 24, 1984, appellees filed a motion to show cause why appellants should not be held in contempt for allegedly violating the preliminary injunctions. After the trial court bifurcated the proceedings so that the issues of the preliminary injunction and the appellants' alleged contempt could be held separate from the issues involved in a counterclaim filed by appellant Reed, a trial was had on the issues of the permanent injunction and the appellants' alleged contempt before the court on September 5, 1984. The result of that trial was a judgment issued on December 11, 1984, issuing a permanent injunction against all the appellants enjoining them from picketing on appellees' property and also finding all appellants in contempt of court for violating the previous preliminary injunctions. It is from that judgment that the appellants appeal.

Addressing appellants' first assignment of error, they claim that the trial court should have dismissed appellees' claim because appellees did not answer appellants' interrogatories in a timely fashion and, also, that the trial court should not have issued a protective order relieving appellees from answering certain interrogatories. Appellants Stasa, Gaski, M. Ganzel, J. Ganzel and Marygrove Catholics United For Life submitted interrogatories to appellees on January 24, 1984, to be answered within twenty-eight days pursuant to Civ. R. 33(A). On February 29, 1984, appellant Reed submitted similar interrogatories to appellees to be completed within twenty-eight days pursuant to Civ. R. 33(A). Appellees did not answer the interrogatories within the prescribed time but instead filed motions for protective orders as to appellant Reed's interrogatories on May 2, 1984, and as to the other appellants' interrogatories on May 11, 1984. The motions for protective orders sought to relieve appellees from answering certain interrogatories. The appellees objected to, among other things, providing appellants with the names of patients who were at Toledo Medical Services on certain dates and also the names of employees of Toledo Medical Services. The trial court granted appellees' motion for a protective order and thereby relieved appellees from answering the interrogatories requesting the names and addresses of the patients of Toledo Medical Services and also the names and addresses of the employees of Toledo Medical Services.

Appellants argue that the trial court should have dismissed appellees' suit for not timely answering the interrogatories pursuant to Civ. R. 41(B) and/or 37(D). First, Civ. R. 41(B)(1) allows a dismissal for failure to prosecute; however, failure to answer interrogatories is not a ground for dismissal under Civ. R. 41(B)(1). See *Schreiner* v. *Karson* (1977), 52 Ohio App. 2d 219, 6 O.O. 3d 237, 369 N.E. 2d 800; *Societe Internationale Pour Participations Industrielles* v. *Rogers* (1958), 357 U.S. 197. The proper rule to be used when there is a failure to comply with discovery is Civ. R. 37. Under Civ. R. 37(D), a party is subject to the sanctions listed in subsections (a), (b), and (c) of subdivision (B)(2) of Civ. R. 37, for failing to answer interrogatories. Subsection (c) of subdivision (B)(2) of Civ. R. 37 allows for the dismissal of the action against the disobedient party. Appellants claim it was error for the trial court not to dismiss the action due to appellees' failure to

answer the interrogatories within the prescribed time. The sanction of dismissal should only be used in extreme situations and should only be used "where circumstances demonstrate evasion and total avoidance of responsibility by a party to respond to discovery requests." *Smith* v. *Smith* (1982), 5 Ohio App. 3d 185, 189, 5 OBR 369, 374, 450 N.E. 2d 736, 740. The trial court has broad discretion in discovery matters. See *State, ex rel. Daggett,* v. *Gessman* (1973), 34 Ohio St. 2d 55, 63 O.O. 2d 88, 295 N.E. 2d 659; *Penn Central Transp. Co.* v. *Armco Steel Corp.* (C.P. 1971), 27 Ohio Misc. 76, 56 O.O. 2d 295, 271 N.E. 2d 877. We cannot say that the trial court abused its discretion by not finding that appellees demonstrated an "evasion and total avoidance of responsibility" in not timely responding to appellants' interrogatories because they subsequently moved for a protective order thereby demonstrating their responsibility in respect to discovery. Therefore, the trial court did not err by refusing to dismiss appellees' claim because they did not timely respond to appellants' interrogatories.

Appellants also claim in their first assignment of error that the trial court improperly granted appellees' motion for a protective order pursuant to Civ. R. 26(C). The trial court held that appellees did not have to supply appellants with the names and addresses of the patients who had visited Toledo Medical Services and also the names and addresses of employees who worked at Toledo Medical Services. Appellees filed their motion for a protective order after the time for responding to appellants' interrogatories had run. However, it is within the trial court's discretion to grant an untimely motion for a protective order. *Rogers* v. *Kazee* (1983), 10 Ohio App. 3d 139, 10 OBR 190, 460 N.E. 2d 1149. The granting of a protective order can be overturned on appeal only upon a finding that the trial court

abused its discretion in granting the protective order. *Otero* v. *Buslee* (C.A. 10, 1982), 695 F. 2d 1244. In the case *sub judice,* the names and addresses of Toledo Medical Services' patients and employees may have been viewed by the trial court as non-discoverable for many different reasons. As to the names and addresses of the patients, the trial court could very well have found that this information fell within the physician-patient privilege and was therefore confidential and not discoverable. The trial court could have also found that the names of the patients and employees were not relevant to the case. The trial court could have also found that in light of appellants' previously demonstrated zealous convictions over the issues involved, that if appellants would have received the names and addresses of the patients and employees they may have misused this information to the detriment of those patients and employees. For the foregoing reasons, we determine that the trial court did not abuse its discretion in granting appellees' motion for a protective order relieving them of supplying the appellants with the names and addresses of patients and employees of Toledo Medical Services.

For the foregoing reasons, we find appellants' first assignment of error not well-taken.

For appellants' second assignment of error, they contend that the trial court made numerous improper evidentiary rulings. Initially, appellants argue that the trial court erred in allowing Dr. Armstrong to testify that he owned four units of Fairfield Commons because they claim that his ownership could only be proven by an original deed. Appellants claim that the best evidence rule controls this situation and, as such, the trial court's finding that Dr. Armstrong owned four units of Fairfield Commons was erroneous because the court did not insist on having appellees produce the original deeds. Appellants' reliance on

the best evidence rule as it is codified in Evid. R. 1002 is misplaced. That rule states:

"To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio."

This rule comes into effect only when there is an attempt to prove the content of a writing. It does not require that a writing must be produced where a fact can be proved by a writing. Appellants seem to argue that the best evidence rule requires that a party must use the very best evidence available to prove a fact. The best evidence rule as embodied in Evid. R. 1002 simply means that if an individual intends to prove the content of a specific writing, the original of that writing should be used.

Appellee, Dr. Armstrong, testified that he owned four condominium units in Fairfield Commons and appellants provided no evidence to the contrary. Dr. Armstrong was not required to prove his ownership via deed because all he was required to prove to maintain the instant action was that he has a superior right to possession than the appellants and this superior right can be shown by "acts of ownership and dominion" or simply by testimony to that effect. See *Pearl* v. *Pic Walsh Freight Co.* (1960), 112 Ohio App. 11, 12, 15 O.O. 2d 338, 339, 168 N.E. 2d 571, 572. Appellants are incorrect in asserting that Dr. Armstrong had to produce an original deed in order to maintain this action.

Relevant to the second assignment of error, appellants also claim that appellees had to produce an original copy of the condominium association's declaration of condominium property and also an original written agreement allowing Dr. Armstrong to act as the association's agent in pressing this lawsuit, again somehow based on the best evidence rule. These contentions are wholly without merit. As we noted above, the best evidence rule in Ohio simply means that if a party seeks to prove the content of a writing, he should produce the original of that writing at court. It does not mean that a party must prove a fact with the best evidence possible. Aside from the fact that the best evidence rule is not applicable in this circumstance, appellants' argument fails for additional reasons. First, Dr. Armstrong did not have to prove he was acting as agent for the Fairfield Commons Condominium Association in order for him to be a proper party to this suit as he had standing as the owner of the condominium units which were being picketed by appellants. Second, the doctor testified that he represented the interests of the association and appellants failed to put forth any evidence that disputed this. Third, appellants never put the existence of the condominium association into issue thereby making proof of its existence unnecessary. Last, appellants never made timely objections on these issues at trial where appellees could have presented evidence on these issues; instead, they raised these issues for the first time on appeal. The trial court did not err by failing to require appellees to introduce into evidence an original copy of the association's declaration of condominium property and an original written agreement allowing Dr. Armstrong to act on behalf of the association.

Next, appellants urge that the trial court erred by admitting testimony relative to dates of alleged trespasses of appellant Reed, which dates were not included in appellees' answer to appellant Reed's interrogatories. In the interrogatories submitted by appellant Reed to appellees on February 29, 1984, she asked appellees to list the dates that she had allegedly trespassed on appellees' property and thereby violated the restraining orders. In response to appellant Reed's interrogatories, appellees

listed nineteen dates that Reed was on appellees' property in violation of the restraining orders. During trial, the trial court allowed testimony relevant to appellant Reed's violation of the restraining orders on dates which were not included in the answers to appellant Reed's interrogatories. However, the trial court did prohibit some testimony relevant to Reed's violation of the restraining orders on dates that were not included in the answers to appellant Reed's interrogatories. Again, this is an area where sanctions for non-compliance with discovery should be utilized only in extreme situations. The Summit County Court of Appeals has held that "[t]he exclusion of reliable and probative evidence is a severe sanction and should be invoked only when clearly necessary to enforce willful non-compliance or to prevent unfair surprise." *Nickey* v. *Brown* (1982), 7 Ohio App. 3d 32, 34, 7 OBR 34, 37, 454 N.E. 2d 177, 180. Appellants have failed to show that the non-disclosure of certain dates was a result of wilful non-compliance, nor have they shown how they have been unfairly surprised by the testimony relevant to the excluded dates. However, even if all the testimony relevant to appellant Reed's violations of the restraining orders on the dates not listed in the answers to her interrogatories should have been excluded, the inclusion of the testimony relevant to those dates was not reversible error. There was an overwhelming amount of credible evidence introduced at trial, including admissions by appellant Reed herself, that Reed had repeatedly violated the restraining orders by going onto appellees' property and even into the Toledo Medical Services' suite. Therefore, even if it were error for the trial court to allow testimony concerning dates that appellant Reed had violated the restraining orders, which dates were not included in the answers to her interrogatories, that error was harmless.

Appellants' last argument in respect to their second assignment of error is that the trial court erroneously admitted photographs without the photographer, who took the photographs, saying the magic words that the photographs were "a fair and accurate depiction" of the scene. The photographs in question (exhibits 3 through 13) were taken by a professional photographer at the behest of appellees. The photographer was called to testify and he stated that he had taken the pictures and he also attempted to describe the location of the individuals who were in the pictures. The photographer never explicitly stated that the photographs were "a fair and accurate depiction," of the scene as he saw it that day. However, this was implicit in the photographer's testimony because he attempted to describe the photographs and never indicated that they were not an accurate depiction of the scene at the time he took the pictures. Additionally, appellants never disputed the accuracy of the photographs and in fact appellants' counsel stated that "the pictures speak for themselves," thereby implying that the photographs were accurate. However, even if the photographs were erroneously admitted into evidence, that admission is not grounds for reversal. As with the testimony about dates not included in the answers to appellant Reed's interrogatories, the admission of these photographs is at most harmless error because there was so much overwhelming evidence of the appellants' violations of the restraining orders that these photographs were merely surplusage.

For the foregoing reasons, we find appellants' second assignment of error not well-taken.

For their third assignment of error, appellants contend that the issuance of the permanent injunction is an infringement on their First Amendment rights. Appellants break down this assignment

of error into three subdivisions; however, the first two subdivisions are in reality the same issue and will be considered together. The crux of appellants' argument in this regard is that the trial court erred in finding that the Fairfield Commons Condominium complex is private property from which appellees have a legal right to exclude appellants.

The Fairfield Commons Condominium complex consists of three buildings. They are set in a northerly line from Monroe Street, which street runs east and west in the city of Toledo, Lucas County, Ohio. The first building is approximately two hundred feet from the center of Monroe Street, the second building is approximately three hundred fifty feet from the center of Monroe Street, and the third building is approximately four hundred fifty feet from the center of Monroe Street. Toledo Medical Services, which is where abortions are performed and which is the object of appellants' protest, is located within the second building. A driveway, which is about thirty feet wide, enters off Monroe Street, crosses a public sidewalk, and then continues back to a parking lot which fronts and is on the east side of the three buildings. The parking lot is used solely for the three office buildings of the condominium complex. There is a "private property, no trespassing" sign on the driveway leading into the parking lot. The public sidewalk is approximately four feet wide and is the area in which the appellants are allowed to carry on their protest under the restraining orders.

The condominium complex buildings house only professional offices such as for psychiatrists, attorneys, dentists and physicians. The professionals within the complex treat their clients and invite them onto the premises by appointment only. The entire condominium complex is located in one of the, if not the, largest commercial areas in the city of Toledo, Lucas County, Ohio.

Appellants argue that Fairfield Commons Condominium complex is imbued with a public purpose and as such appellees cannot prohibit them from picketing on their property because to do so would infringe on appellants' First Amendment rights. Appellants rely on the United States Supreme Court case of *Amalgamated Food Employees Union, Local 590* v. *Logan Valley Plaza, Inc.* (1968), 391 U.S. 308, 45 O.O.2d 181, in supporting their claim that they have a right to picket on appellees' property and not to be confined to the public sidewalk. In *Logan,* the court addressed the issue of whether owners of a shopping mall could exclude individuals from picketing on that mall's property. The court held that the individuals could not properly be excluded, but that case must be viewed solely in light of the specific facts presented there. The court recognized that in a different factual context, an individual's rights in private property would outweigh other individuals' First Amendment rights. The court stated:

"* * * All we decide here is that because the shopping center serves as the community business block 'and is freely accessible and open to the people in the area and those passing through,' *Marsh* v. *Alabama* [1946], 326 U.S. [501], at 508, the State may not delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put.

"* * * Thus where property is not ordinarily open to the public, this Court has held that access to it for the purpose of exercising First Amendment rights may be denied altogether.* * *" *Id.* at 319-320, 45 O.O. 2d at 187.

The court in *Logan* seemed to focus on the concept that the mall in question there was the functional equivalent of a business district and the sidewalks lead-

ing from building to building within the mall were "the functional equivalents of the streets and sidewalks of a normal municipal business district." *Id.* at 319, 45 O.O. 2d at 187. The court reasoned that since the mall is a functional equivalent of a business district it should be treated as a public forum where individuals could not be prohibited from expressing their views.

Subsequent to *Logan,* the Supreme Court decided *Lloyd Corp., Ltd.* v. *Tanner* (1972), 407 U.S. 551. The *Lloyd* case likewise dealt with the constitutionality of excluding picketers from a shopping mall. The majority opinion written by Justice Powell in this sharply divided decision seemed to question the *Logan* court's reliance on the functional equivalence test. The following passage from Justice Powell's majority opinion can best be described as the current status of the law in this area:

"The basic issue in this case is whether respondents, in the exercise of asserted First Amendment rights, may distribute handbills on Lloyd's private property contrary to its wishes and contrary to a policy enforced against *all* handbilling. In addressing this issue, it must be remembered that the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on *state* action, not on action by the owner of private property used nondiscriminatorily for private purposes only. The Due Process Clauses of the Fifth and Fourteenth Amendments are also relevant to this case. They provide that '[n]o person shall . . . be deprived of life, liberty, or property, without due process of law.' There is the further proscription in the Fifth Amendment against the taking of 'private property . . . for public use, without just compensation.'

"Although accommodations between the values protected by these three Amendments are sometimes necessary, and the courts properly have shown a special solicitude for the guarantees of the First Amendment, this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only. Even where public property is involved, the Court has recognized that it is not necessarily available for speaking, picketing, or other communicative activities.* * *

"* * *

"Respondents contend, however, that the property of a large shopping center is 'open to the public,' serves the same purposes as a 'business district' of a municipality, and therefore has been dedicated to certain types of public use. The argument is that such a center has sidewalks, streets, and parking areas which are functionally similar to facilities customarily provided by municipalities. It is then asserted that all members of the public, whether invited as customers or not, have the same right of free speech as they would have on the similar public facilities in the streets of a city or town.

"The argument reaches too far. The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use. The closest decision in theory, *Marsh* v. *Alabama, supra,* involved the assumption by a private enterprise of all of the attributes of a state-created municipality and the exercise by that enterprise of semi-official municipal functions as a delegate of the State. In effect, the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State. In the instant case there is no comparable assumption or exercise of municipal functions or power.

"Nor does the property lose its private character merely because the public is generally invited to use it for designated purposes. Few would argue that a

free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there. Nor is size alone the controlling factor. The essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center. This is not to say that no differences may exist with respect to government regulation or rights of citizens arising by virtue of the size and diversity of activities carried on within a privately owned facility serving the public. There will be, for example, problems with respect to public health and safety which vary in degree and in the appropriate government response, depending upon the size and character of a shopping center, an office building, a sports arena, or other large facility serving the public for commercial purposes. We do say that the Fifth and Fourteenth Amendment rights .of private property owners, as well as the First Amendment rights of all citizens, must be respected and protected. The Framers of the Constitution certainly did not think these fundamental rights of a free society are incompatible with each other. There may be situations where accommodations between them, and the drawing of lines to assure due protection of both, are not easy. But on the facts presented in this case, the answer is clear.

"We hold that there has been no such dedication of Lloyd's privately owned and operated shopping center to public use as to entitle respondents to exercise therein the asserted First Amendment rights.* * *" (Emphasis *sic*. Footnotes omitted.) *Id.* at 567-570.

From the above-quoted passage this court concludes that where property has fewer attributes of being public in nature than a shopping mall, such as in the case *sub judice*, the property owners' rights weigh more heavily in the balance than an individual's First Amendment rights. Since the trial court could have properly found that the property at issue in the case *sub judice* had more indicia of privateness than the shopping mall in *Lloyd*, the trial court did not err in issuing a permanent injunction enjoining appellants from picketing on appellees' property and confining appellants' protest to the public sidewalk in front of appellees' property.

Appellants' next contention is that the trial court erred by issuing a permanent injunction enjoining appellants' picketing at appellee Dr. Carl Armstrong's residence. Applying the principle set forth in *Lloyd, supra,* the more attributes property has of being private the stronger the individual owner's private property rights are in relation to other persons' First Amendment rights to picket on that property. Not only are Dr. Armstrong's property rights being infringed by appellants' picketing, but also his right to privacy. Dr. Armstrong's property rights and rights to ·privacy clearly outweigh appellants' First Amendment rights to picket on that property. See *Pipe Machinery Co.* v. *DeMore* (App. 1947), 49 Ohio Law Abs. 536, 36 O.O. 342, 76 N.E. 2d 725.

For the foregoing reasons, we find appellants' third assignment of error not well-taken.

For the fourth assignment of error, appellants' assert that certain of the trial court's findings of fact were against the manifest weight of the evidence. First, appellants assert that appellees were not entitled to damages because they proved none. It is well-settled Ohio law that once a party proves that he has been trespassed against that party has a right to nominal damages without specifically proving actual damages. See *Pearl* v. *Pic Walsh Freight Co.*, *supra.* Once appellees proved that they had a superior right to possession and that appellants came upon their prop-

erty without permission, they had established a prima facie case of trespass and were entitled to nominal damages. As stated before, Dr. Armstrong testified that he was the owner of four units at Fairfield Commons thereby showing he had a superior right to possession than appellants and there was an overwhelming amount of testimony that appellants had come onto appellees' property without permission. This evidence established a prima facie case of trespass and, since appellants did not effectively dispute this evidence, the trial court did not err in finding appellants guilty of trespass, and awarding damages.

Next, appellants assert that appellees were not entitled to attorney fees because the awarding of attorney fees is proper only where a party's conduct has been outrageous. Virtually uncontradicted evidence was presented that the majority of the appellants had repeatedly violated the restraining orders and picketed on appellees' property. The trial court did not err in awarding attorney fees.

Last, appellants assert that the trial court erred by treating all defendants the same as to jail sentences, as well as assessing fees and costs equally. Appellants specifically argue that the finding by the trial court that J. Gaski, J. Ganzel, and K. Moriarity had violated the restraining orders was against the manifest weight of the evidence. The standard a reviewing court should employ in the face of assertions that a judgment is against the manifest weight of the evidence was set out in *C. E. Morris Co.* v. *Foley Construction Co.* (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578, syllabus of the court, as follows:

"Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." See, also, *Seasons Coal Co.* v. *Cleveland* (1984), 10 Ohio St. 3d 77, 10 OBR 408, 461 N.E. 2d 1273.

In order for a court to find an individual in contempt for violating a restraining order, the court must find that, first, the individual had notice of the restraining order and, second, that the individual did an act in violation of that restraining order. All appellants had notice of the restraining orders. As to K. Moriarity, there was conflicting evidence as to whether she violated the restraining orders. However, there was competent, credible evidence going to this issue presented by appellees that she did violate the restraining orders. The trial court's finding that K. Moriarity was in contempt was not against the manifest weight of the evidence.

As to J. Ganzel and J. Gaski, there was absolutely no evidence put forward that they violated the express terms of the restraining orders and in fact there was a stipulation entered into by the parties that these two individuals did not violate the restraining orders. The finding by the trial court that J. Gaski and J. Ganzel violated the restraining orders was against the manifest weight of the evidence and, as such, appellants' fourth assignment of error as to those two individuals is found well-taken. As to all other individuals, appellants' fourth assignment of error is found not well-taken.

For the fifth assignment of error, appellants claim that the trial court erred by bifurcating the trial on the issues of the permanent injunction and the contempt from the issues involved in appellant Reed's counterclaim. As was stated *supra,* appellees' cause of action seeks a permanent injunction against appellants' picketing activities on appellees' property and the recovery of the costs of the action. The contempt proceeding was to determine whether appellants should be held in contempt for violation of the temporary restraining orders and preliminary injunctions. Appellant

Reed's counterclaim, filed on November 30, 1983, sought injunctive relief, compensatory damages, and punitive damages for the alleged mental distress inflicted upon appellant Reed by appellee Dr. Armstrong. The infliction of the mental distress is alleged to have occurred by the conduct of Dr. Armstrong in damaging appellant Reed's personal property on the date of October 6, 1983. Appellant Reed requested a jury trial on her counterclaim which request was later granted. After a hearing on the issue, the trial court held that the issues raised by appellees' complaint and the motion to show cause were predominately equitable in nature, that appellant Reed's counterclaim was predominately an action at law, that the permanent injunction issue and the contempt issue should be tried together and that the issues presented by appellant Reed's counterclaim should be bifurcated from the other two issues and a separate jury trial would be had on appellant's counterclaim after a trial to the court was had on the issue of the permanent injunction and the contempts.

Civ. R. 42(B) allows a court to bifurcate a trial and allow separate trials of different issues. That rule reads:

"Separate trials. The court, after a hearing, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, or third-party claims, or issues, always preserving inviolate the right to trial by jury."

A trial court is in the best position to ascertain whether a bifurcation of the issues is necessary and that court, therefore, has broad discretion in doing so. See *Heidbreder* v. *North Hampton Twp. Trustees* (1979), 64 Ohio App. 2d 95, 18 O.O. 3d 78, 411 N.E. 2d 825. In the case *sub judice*, the issues raised by appellees' complaint for an injunction and their motion for appellants to show cause why they should not be held in contempt, were to be tried before the court whereas appellant Reed's counterclaim seeking damages was to be tried before a jury. The fact that some issues were to be tried to the court and others to be tried to a jury made this case an ideal one for bifurcation. First, if the trial were not separated, the jury impanelled for appellant Reed's counterclaim might have become confused as to what issues and facts they were to decide. Second, it would be very inconvenient to the parties not involved in appellant Reed's counterclaim to have to attend the days of trial which solely addressed the issue of appellant's counterclaim. Third, due to the emotionally charged nature of the issues involved, it may have been prejudicial for the jury to hear evidence which was relevant solely to the injunction and contempt issues. For all the foregoing reasons, the trial court did not abuse its discretion in bifurcating the injunction and contempt issues from the emotional distress issue raised in appellant Reed's counterclaim. We find appellants' fifth assignment of error not well-taken.

As a sixth assignment of error, appellants claim that the trial court erred in not finding that their trespasses and violations of the restraining orders were justified by necessity. Appellants subdivide this assignment of error into three divisions. It will not be necessary to address each subdivision separately because all revolve around the same argument. Appellants' argument in this regard is simply that their attempts to stop abortions from taking place on appellees' property is a legal necessity which justifies their trespass in violation of the trial court's restraining orders.

The United States Supreme Court has found that abortions are not illegal. *Roe* v. *Wade* (1973), 410 U.S 113. Protesting such activity was found by the

trial court in the instant case not to constitute a necessity justifying appellants' activities. The trial court did not err in failing to find that appellants' activities were justified by a legal necessity. Appellants' sixth assignment of error is not well-taken.

Upon consideration whereof, we find that substantial justice has not been done all the parties complaining. Specifically, we find that the trial court was in error in finding John E. Gaski and Joseph Ganzel in contempt for violation of that court's restraining orders. Therefore, we reverse the trial court's finding only so far as that court held John E. Gaski and Joseph Ganzel in contempt. This cause is remanded to the trial court for a modification of its award of damages and any further proceedings not inconsistent with this decision. Costs to be shared equally, one half to appellants and one half to appellees.

*Judgment reversed in part and affirmed in part.*

CONNORS, P.J., and WILKOWSKI, J., concur.