**Stephanie Morello ARMES, Michael McMonagle and Joseph Wall, Plaintiffs,**

v.

**CITY OF PHILADELPHIA, Defendant.**

**Civ. A. No. 87–7356.**

United States District Court,
E.D. Pennsylvania.

Feb. 13, 1989.

---

Mark L. Tunnell, Gawthrop, Greenwood & Halsted, West Chester, Pa., for plaintiffs.

Guy Vilim, Deputy City Sol., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

KATZ, District Judge.

This case involves a challenge by anti-abortion protestors to the City of Philadelphia's enforcement of the Pennsylvania defiant trespass statute. Plaintiffs ask this Court for money damages, a declaratory judgment that their arrests were unconstitutional and an injunction preventing their arrest for similar conduct in the future. Because I find that the plaintiffs' right to express their deeply felt views stops at the private property line of the abortion clinic, I will deny plaintiffs' requests.[1]

The stipulated facts are as follows:

1. The Northeast Women's Clinic (hereinafter "NEWC") is a private corporation that operates a clinic which conducts abortions and other pregnancy related services.

2. In 1976, the NEWC leased office space on the second floor of a multi-tenanted office building situate at 9600 Roosevelt Boulevard, Philadelphia, PA.

3. The office building was privately owned by Gemini Corp. and managed for it by J.T. Jackson Realty Company of Philadelphia.

4. From the time of its opening in 1976 to the date of plaintiffs' arrests on October 5, 1985, the NEWC has been the focus of demonstrations and protest activities involving the abortion issue.

5. Abortions were scheduled on Saturdays among other days of the week.

6. On nearly every Saturday over these years, persons would be present to express their opposition to abortions.

7. The physical premises of 9600 Roosevelt Boulevard is further characterized by a parking lot adjacent to the northeast side of the building and two sidewalks, one leading from the parking lot to the front door of the building, which runs along the front of the building, and the other the public sidewalk, abutting 9600 Roosevelt Boulevard.

8. The two sidewalks parallel one another and are separated by a lawn area of more than 20 feet in width. This grass lawn was also privately owned by the Gemini Corporation.

9. The Saturday protest activity of October 5, 1985 did not involve any sit-in type demonstration within the building or any blocking the front door thereof. Rather it was essentially limited to the appearance of 20–30 people who, except as described below, would stand on the public sidewalk, some of whom held signs. They would, on the public sidewalk, kneel, pray or chant, as well.

10. Generally, the same activity was true for other Saturdays as well.

11. On occasion, during these protests, the protest activity became unruly, involving the use of bullhorns, and shouting vivid descriptions such as "abortion is murder."

---

1. The parties have submitted stipulated facts to the Court. I will treat defendant's Motion for Summary Judgment as a trial brief and will rule on the basis of the stipulated facts.

The police were present during protests to preserve peace and order.

12. In addition, on most protest days, including October 5, 1985, as the business patrons of the clinic would arrive in the parking lot, one person or another involved in the protest group would leave the public sidewalk and walk onto the parking lot or up to the inner sidewalk in an attempt to voice their opinion about abortion—and possible alternatives—and to distribute leaflets. Such "counseling" activity was often done on a one-on-one basis and in a conversational tone of voice, but did sometimes become rushed and confrontational.

13. Because of the activity of the protestors, including plaintiffs and others, the NEWC applied to the Court of Common Pleas of Philadelphia County for injunctions, which were duly granted on December 23, 1977 and on August 31, 1983 and which are attached as Exhibits to the Stipulation.

14. From time to time the NEWC would contact the Sheriff of Philadelphia County in order to enforce the injunctions aforementioned, as was the Sheriff's responsibility.

15. The arrests of plaintiffs on October 5, 1985, marked the first arrests of protestors for activity outside the building at this location.

16. Because of the conflict between opposing sides at this site, from 1977 until October, 1985, the Police Department of the City of Philadelphia routinely maintained and monitored demonstrations at this side, through its civil affairs unit.

17. Prior to and including October 5, 1985, the police presence was designed to preserve peace, order, property and physical safety at the location. The police did so primarily by ensuring that protestors remained orderly and by asking protestors to move off the parking lot, grass lawn and inner sidewalk when protestors moved from the public sidewalk thereto. Some protestors did, routinely, move from the public sidewalk to the lawn, inner sidewalk, and parking lot in an effort to convey their messages.

18. Ardis Ryder was the administrative director of the NEWC in 1985 and for sometime prior thereto.

19. Ardis Ryder spoke to officers of the City of Philadelphia regularly concerning their handling of the persons demonstrating outside the building. Mainly she complained that the police were not aggressive enough in keeping the demonstrators off the private property.

20. In the Summer of 1985, she spoke to Captain Shanahan and officers, as did counsel to the NEWC.

21. Ardis Ryder mentioned that she was weary of calling the Sheriff to be present to enforce any injunction violations. He also charged the clinic for his department's services.

22. During these conversations, the City learned that "no trespassing" signs would be erected on the building at 9600 Roosevelt Boulevard, and that they would go up prior to Saturday, October 5, 1985. The NEWC implored Captain Shanahan and others to arrest any person who appeared to be passing out leaflets or talking to clinic patients within the boundary lines of the private property.

23. In August of 1985, the NEWC filed suit before this court (*NEWC v. McMonagle, et al.*, C.A. No. 85–0845) against one or more of the plaintiffs charging them with RICO violations for certain of their activities; among which were complaints that the protestors had entered the clinic building itself in an effort to disrupt abortion activity, during which invasions medical equipment was destroyed. The second and most recent such entry occurred August 10, 1985, and resulted in 12 arrests.

24. Prior to October 5, 1985, two signs, each measuring approximately 2 feet by 2 feet, were erected on the clinic building. The signs stated:

"Private Property"

"No trespassing on parking lot, building or sidewalk area against building. Only tenants and their invitees are permitted on the parking lot, building or sidewalk area."

25. Prior to October 5, 1985, police had investigated the location of the building

owner's property lines. They did so by checking City records and by discussing the issue with the real estate agent managing the property on behalf of the owner, Gemini Corporation. Captain Shanahan, the ongoing police supervisor for this location, made these contacts personally. As a result of his inquiries, he learned that the private-public property boundary line ran through the grass lawn area parallel to the front of the building and parallel to the two sidewalks and Roosevelt Boulevard, and a few feet in from the public sidewalk. A large "Health America" sign, located very near this boundary in the lawn, became the landmark to identify the boundary. Neither Captain Shanahan nor any other police personnel ever received information to contradict the legitimacy of this boundary.

26. Based on his information, Captain Shanahan told the lieutenants, sergeants, and police officers under his command of the location of the boundary. Officers on duty at the clinic on Saturday, October 5, 1985 had this information.

27. Prior to, and again effective on October 5, 1985, Ardis Ryder and J.T. Jackson Realty told the police that demonstrators did not have their permission to be present within the said property lines.

28. On October 5, 1985, Stephanie Armes, Joseph Wall and Michael McMonagle all crossed onto the private property several times each. Each time they did so, police officers warned them to return to the public sidewalk or face arrest. Stephanie Armes was arrested after several warnings when she walked onto the private property up to the inner sidewalk and tried to hand literature to a clinic patron.

29. Joseph Wall was arrested after several warnings when he knelt down on the grass near the inner sidewalk and refused to move after being instructed several times by an officer to do so.

30. Similarly, Michael McMonagle was arrested while standing on the interior sidewalk in order to talk to the clinic's patrons and after several warnings to return to the public sidewalk.

31. Officer Oliverio saw other people who were not building patrons going across the property, but did not arrest them; these people were not part of the protest group.

32. At all times material hereto, the premises and building were open to the public in accordance with the posted "no trespassing" signs.

33. Plaintiffs were each arrested and charged by the Philadelphia District Attorney's Office with misdemeanors of the third degree, to wit defiant trespass and conspiracy under criminal complaints, a copy of one of which is appended to the Stipulation.

34. On October 5, 1985, as well as many other Saturdays, persons from the National Abortion Rights Actions League (NARAL) were present on the private property outside the building. For identification purposes, these persons known as "escorts" were dressed in blue smocks with yellow buttons containing the word "CHOICE." The activity of these escorts was to surround clinic patrons while the patrons moved from their cars into the clinic building.

35. Michael McMonagle was arrested at approximately 8:45 a.m., was taken to a local precinct and processed. His processing lasted approximately 10 hours.

36. Michael McMonagle was previously and has since October 5, 1985 been arrested on a number of occasions for activities at anti-abortion protests, and he is not claiming police brutality or mistreatment.

37. Joseph Wall was arrested at approximately the same time. He was taken to the district station at Levick & Harbison, and placed in a cell during his processing. He was unprepared for arrest and did not have identification on him. To verify his identity, the police called his employer (The Philadelphia Controller), and thereby informed them of his arrest. Joseph Wall was previously and has, since October 5, 1985, been arrested on a number of occasions for activities at anti-abortion protests, and he is not claiming police brutality or mistreatment.

38. All plaintiffs were fingerprinted and photographed as occurs during normal police processing of persons arrested.

39. McMonagle and Wall were given bail hearings via television before the bail commissioner who was at the "Roundhouse," as is normal in police processing of persons arrested on misdemeanor charges.

40. Stephanie Morello, now known as Stephanie Morello Armes, was taken directly to the Central Police Headquarters, the "Roundhouse," and put in a cell separate from the other women who had been arrested at 9600 Roosevelt Boulevard. She was held in the holding cell until a bail hearing at approximately 9:00 p.m., when she was released on her own recognizance.

41. Stephanie Armes makes no claim that she was treated brutally or in any way other than normally by the police.

42. In November, 1985, the plaintiffs appeared for a preliminary arraignment in Room 146 of City Hall. Eventually they received notice of trial scheduled for February 18, 1986 at 8:30 a.m., Room 116, City Hall, Philadelphia.

43. During the months between arrest and hearing, plaintiffs faced the real prospect of being prosecuted in a public criminal court and jail or fined for the misdemeanors charged to them.

44. Additionally, plaintiff Stephanie Morello, during these months, faced the prospect of possible loss of her job in the event of conviction.

45. The approximate costs expended for the plaintiffs' legal defense was $300 each.

46. Throughout this process, the plaintiffs held the honest belief that they were privileged to be present at the place of their arrest and to express themselves as they were doing at the time of their arrests.

47. They appeared for trial on February 18, 1986, with counsel, and at the conclusion of the Commonwealth's case Judge Conroy of the Municipal Court sustained demurrer to the complaints against all three plaintiffs.

48. Arrests on the charge of criminal trespass were continued for the same type of outside protest activity under similar circumstances on October 12, 1985 and on subsequent protest days. All such arrests occurred on private property under circumstances similar to those involved here. Additionally, there were other arrests after October 5, 1985 on occasions when protestors again entered the clinic itself. Such entries occurred on October 19, 1985 and on May 23, 1986 at 9600 Roosevelt Boulevard.

49. The NEWC moved from its location at 9600 Roosevelt Boulevard to its present location at Comly Road and Roosevelt Boulevard in early May, 1986.

50. Arrests for defiant trespass at that location under similar circumstances continued commencing June 21, 1986 and continuing through July 28, 1987.

51. A summary of the dispositions of those trials is attached as an exhibit to the Stipulation.

52. Captain Shanahan became a captain of the Civil Affairs Bureau in October, 1982.

53. He was familiar with and discussed the situation at 9600 Roosevelt Boulevard and what the police response should be to it with Ralph Teti.

54. Ralph Teti was the Divisional Deputy City Solicitor working with the Special Litigations Unit from 1984 on.

55. Mr. Teti had, for 13 years, been involved on behalf of the City Solicitor's Office in police matters with respect to civil demonstrations. Mr. Teti had been present at 9600 Roosevelt Boulevard on one occasion in 1985, prior to the plaintiffs' arrests, and was also at an October 31, 1985 meeting with Captain Shanahan and anti-abortion demonstrators at the 8th Police Precinct, as well as other police/protestor meetings between 1985 and 1987.

56. Mr. Teti also attended police/clinic meetings requested by the NEWC, at which Ardis Ryder and counsel were present, to listen to the latters' complaints of uneven police enforcement and complaining that there had not been enough arrests.

57. Mr. Teti's position, which he communicated to Captain Shanahan and to other police crews respecting the handling of Saturday activity of the kind hitherto described may be summarized as follows:

"Any demonstrator, including a peaceful demonstrator, who goes upon the private property at 9600 Roosevelt outside the building and is not a business invitee is subject to arrest for defiant trespass."

58. Mr. Teti gave the following examples of his position:

A. A protestor leafletting on the interior sidewalk at the clinic is subject to arrest.

B. A person walking his or her dog on the interior sidewalk is not subject to arrest.

C. A person using the interior sidewalk to transit the property in order to catch a bus is not subject to arrest.

59. This position applied in this way: if one wore a "sandwich board" sign that said "Ace Hardware," one was not subject to arrest. People known as escorts, some of whom may have been from NARAL, were not subject to arrest on private property for their activity.

60. It was Mr. Teti's advice that demonstration activity on the clinic property in violation of police warnings, even leafletting by one person, subjected the demonstrator to arrest when that property is posted against trespassing and the protestor has no permission from the owners or renters to be present.

61. Mr. Teti was unaware that there was an injunction order at 9600 Roosevelt Boulevard that specifically limited protest activity on the clinic property.

62. Mr. Teti did not know about the results of any specific arrests, whether for defiant trespass on October 5, 1985, or subsequent dates. He did not attempt to keep track of the disposition of those court cases. He also did not alter his advice to the police after he received two or three letters from counsel for the protestors advising him of all the demurrers and acquittals aforementioned.

63. Mr. Teti did not direct the police department to make any specific arrests, nor did he exert any type of supervisory control over the police department.

64. Mr. Teti's superiors at all times material hereto were the Chief Deputy Solicitor who in turn reported to the City Solicitor.

65. In 1984 and 1985, Handsel Minyard was the Chief Deputy City Solicitor, and he became City Solicitor in January, 1986, a position held to January, 1988.

66. The City Solicitor delegated to Ralph Teti and John Myers, as head of the Special Investigations Unit of the City Solicitor's office, primary day to day discretion to make decisions for the City Solicitor in civil rights cases; this unit was referred to as the "Section 1983 Unit" internally.

67. The City Solicitor had daily discussions with members of the unit, some of which focused on the ongoing situation at 9600 Roosevelt Boulevard. The City Solicitor occasionally talked about his office's policy with the Mayor whom he made aware that arrests were being made at the said location pursuant thereto.

68. The City Solicitor neither sought nor received any directions from the Mayor regarding the situation at 9600 Roosevelt Boulevard.

69. Subsequently, in 1986, the Deputy Mayor of the City of Philadelphia referred to the position of the City Solicitor on the legality of the arrests for defiant trespass on private property as expressing the City's position on this issue.

70. The Police Commissioner of the City of Philadelphia also relied on the City Solicitor's position, as previously set forth above.

71. Although the location of the NEWC has changed, the City maintains a policy to this day that protestors, including plaintiffs, are subject to arrest for defiant trespass if, in the course of their protest activity, they enter privately owned property if that property is posted against trespass and if police warnings are ignored.

72. This policy subjects plaintiffs and other protestors to arrests even if the private property they enter is outside the

NEWC building itself during clinic business hours.

### Plaintiffs' First Amendment Claim

■ Plaintiffs claim that their arrests for defiant trespass were unlawful and constitute a violation of their first amendment free speech rights. To succeed on this claim, plaintiffs must show that they were arrested without probable cause.[2] *Losch v. Borough of Parkesburg*, 736 F.2d 903 (3d Cir.1984). On the stipulated facts submitted to this Court, I find that the arresting officers did have probable cause to believe that plaintiffs had committed the offense of defiant trespass.

■ Probable cause exists if the arresting officers reasonably believed that each element of an offense was present at the time of arrest. *Radich v. Goode*, No. 87–7358, slip op. at 2 (E.D.Pa. Sept. 6, 1988) [1988 WL 92867]. Pennsylvania law provides that an individual commits defiant trespass if, knowing that he has no license to do so, he enters or remains on property as to which lawful notice against trespass is given.[3]

■ Each plaintiff entered the NEWC abortion clinic's private property despite repeated notification that such entry was prohibited. The clinic provided plaintiffs with notice by posting signs to protect its property against trespass. In addition, on October 5, 1985, each time plaintiffs Stephanie Armes, Joseph Wall and Michael McMonagle crossed onto the clinic's private property, police officers personally warned them to return to the public sidewalk or face arrest. The plaintiffs were arrested after they repeatedly ignored these warnings against trespass.

■ Plaintiffs claim, however, that their actions fell within the scope of a statutory affirmative defense and that therefore they were arrested without probable cause. The Pennsylvania defiant trespass statute provides that plaintiffs have an affirmative defense if they prove that "the premises were at the time open to members of the public and the actor complied with all lawful conditions imposed on access to or remaining" on the premises. 18 Pa.Cons. Stat.Ann. § 3503(c)(2). Plaintiffs contend that the no trespassing policy does not constitute a lawful condition because it violates their first amendment free speech rights.[4] I find that no grounds exist to support plaintiffs' first amendment claim.

■ "The guarantees of the First Amendment have never meant that people who want to [protest] have a constitutional right to do so whenever and however and wherever they please." *Greer v. Spock*, 424 U.S. 828, 836, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1972), quoting *Adderley v. Florida*, 385 U.S. 39, 48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966). The degree of protection guaranteed by the First Amendment varies depending on the forum in

**2.** In their complaint, plaintiffs assert only that their federal constitutional rights were violated. No claim is made under the Pennsylvania Constitution.

**3.** The Pennsylvania criminal trespass statute provides, in pertinent part:
    (b) Defiant trespasser.
    (1) A person commits an offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by:
        (i) actual communication to the actor; or
        (ii) posting in a manner prescribed by law or reasonably likely to come to the attention of intruders....
    (c) Defenses. It is a defense to prosecution under this section that: ...
    (2) the premises were at the time open to members of the public and the actor complied with all lawful conditions imposed on access to

or remaining in the premises. 18 Pa.Cons.Stat. Ann. § 3503(b), (c) (Purdon 1983).

**4.** I will assume, for the sake of argument only, that the clinic premises were "open to the public." Pennsylvania cases law, however, is to the contrary. In *Pennsylvania v. Dowling* Nos. 2863–6, slip op. at 4, 7 (Pa.Super. June 23, 1988) [—— Pa.Super. ——, 548 A.2d 638 (table) ], the court stated that "the case law demonstrates that because certain premises are open to business invitees does not establish they are open to the public generally for purposes of § 3505(c)(2).... This was a private medical facility and, if anything, it was open to the public to the extent a specific portion of the public needed and desired its services, and with the expectation that the persons seeking assistance could do so in privacy and with the assurance of confidentiality and freedom from harassment would attain".

which the speech occurs. Although any limitation on the fundamental right to express dissenting views must be approached with caution, first amendment rights are weakest where speakers deliver their message on privately owned property.

■ The right to exclude others is a fundamental element of private property ownership, and the First Amendment does not create an absolute right to trespass. *E.g., Kaiser Aetna v. United States,* 444 U.S. 164, 179–180, 100 S.Ct. 383, 392–393, 62 L.Ed.2d 332; *Hudgens v. National Labor Relations Board,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). In *Central Hardware Co. v. NLRB,* 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972), police arrested a Union organizer for trespassing on the privately owned parking lot of a retail hardware store. The Court stated, "before the owner of private property can be subjected to the commands of the First and Fourteenth Amendments the privately owned property must assume to some significant degree the functional attributes of public property devoted to public use." *Id.* at 547, 92 S.Ct. at 2243. The Union argued that because the store's parking lot was "open to the public," it had not acquired the characteristics of a public municipal facility. The Court rejected this position, stating, "[s]uch an argument could be made with respect to almost every retail and service establishment in the county, regardless of size or location. To accept it would.... constitute an unwarranted infringement of long-settled rights of private property protected by the Fifth and Fourteenth Amendments." *Id.*

In *Lloyd Corp. v. Tanner,* 407 U.S. 551, 567–70, 92 S.Ct. 2219, 2228–2229, 33 L.Ed. 2d 131 (1972), a case decided by the Supreme Court on the same day as *Central Hardware,* security guards threatened persons distributing handbills on the property of a privately-owned shopping center with arrest for criminal trespass. The leafletters claimed that because a shopping center includes sidewalks, streets and parking areas, it serves the same function as a municipal business district. They argued that as a result, members of the public have the same free speech rights on shopping center premises as they do on city streets. The Court rejected this argument, holding that:

> [a]lthough accommodations between the values protected by [the First, Fourteenth and Fifth] Amendments are sometimes necessary, and the courts properly have shown a special solicitude for the guarantees of the First Amendment, this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only....[5]

The Court went on to explain that property does not "lose its private character merely because the public is generally invited to use it for designated purposes. [For example], few would argue that a free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there." *Id.*

■ The NEWC is a private corporation which provides gynecological care, counseling and abortion services. The NEWC abortion clinic is located on private property and is open to the public only to the extent that members of the public require its health care services. The clinic's invitation to members of the public who seek to use its services does not transform the clinic into the functional equivalent of a public forum. An abortion clinic does not serve to replace public streets and sidewalks as a forum for the dissemination of ideas and fulfills far fewer of the societal functions of the traditional main street or town market place than does a shopping

---

5. In so holding, the Court greatly narrowed its previous holding in *Amalgamated Food Employees Union v. Logan Valley Plaza,* 391 U.S. 308, 319, 88 S.Ct. 1601, 1608, 20 L.Ed.2d 603 (1968), in which the Court held that the premises of a shopping center which functioned as a town center "are open to the public to the same extent as the commercial center of a normal town." The Court reaffirmed the narrowness of the *Logan Valley* holding in *Hudgens v. NLRB,* 424 U.S. 507, 517–18, 96 S.Ct. 1029, 1035, 47 L.Ed.2d 196 (1976).

center.[6] In this situation, the rights of the private property owner outweigh the rights of the protestors, and plaintiffs have no first amendment right to protest on the clinic grounds.[7]

Even where speech occurs on property owned by the government, if such property is a nonpublic forum the First Amendment does not forbid the content-neutral exclusion of speakers who would disrupt the function of that forum and would hinder its effectiveness for its intended purpose. *Cornelius v. NAACP Legal Defense and Education Fund*, 473 U.S. 788, 811, 105 S.Ct. 3439, 3454, 87 L.Ed.2d 567 (1985). Speech may be regulated in a nonpublic forum if the regulation is reasonable, content-neutral and if it allows ample alternative avenues of communication. *Id.* at 800, 105 S.Ct. at 3448; *Pennsylvania Alliance for Jobs & Energy v. Council of Munhall*, 743 F.2d 182, 185 (3d Cir.1984).

The City's practice of arresting protestors who trespass on the NEWC clinic property was (1) reasonable; (2) content-neutral; and (3) allowed the protestors other avenues of communication. The City's actions to enforce the defiant trespass law constitutes a reasonable protection of the clinic's private property rights. "The police have an obligation to take reasonable steps to attempt to insure that protestors do not cross the line between peaceful protest and violation of the law." *Dowling v. City of Philadelphia*, 855 F.2d 136, 143 (3d Cir.1988). Furthermore, the City did not discriminate on the basis of the content of the protestors' speech. Although on the evidence before this Court, it appears that thus far the City has only arrested anti-abortion protestors, no evidence has been submitted indicating that the clinic allowed any other group an opportunity to protest on its property. All protestors, regardless of their point of view, are prohibited from entering clinic property without permission of the owner. Finally, an alternative avenue of communication existed in the form of the public sidewalk which lies in close proximity to the clinic. Plaintiffs could have communicated their views effectively to clinic clientele and staff by remaining on this sidewalk, where their protest activities were in no way restricted by the defiant trespass law.

The City's actions in preventing anti-abortion protestors from trespassing on private property where they had no proper business purpose does not constitute a violation of the First Amendment.[8]

6. In fact, the owners of the property on which the clinic is located intended the property to serve as a "buffer zone" between clients and protestors.

7. Courts in a number of jurisdictions have held that anti-abortion protestors do not have the right to express their views on the private grounds of medical clinics. Some of these decisions are based on federal constitutional guarantees; others are based on corresponding state constitutional provisions. *See, e.g., Dowling v. Goode*, No. 87–7361, slip op. (E.D.Pa. Jan. 25, 1989) [1989 WL 6380]; *Radich v. Goode*, No. 87–7358, slip op. (E.D.Pa. Aug. 31, 1988) [1988 WL 92867]; *Northeast Women's Center v. McMonagle*, 665 F.Supp. 1147, 1160, (E.D.Pa.1987); *City of Sunnyside v. Lopez*, 50 Wash.App. 786, 751 P.2d 313 (1988); *State v. Horn*, 139 Wis.2d 473, 407 N.W.2d 854 (1987); *Planned Parenthood of Monmouth County, Inc. v. Cannizzaro*, 204 N.J.Super. 531, 499 A.2d 535 (1985), *aff'd*, 217 N.J.Super. 623, 526 A.2d 741 (1987) (adopting opinion of Chancery Division); *Ingram v. Problem Pregnancy of Worcester, Inc.*, 396 Mass. 720, 488 N.E.2d 408 (1986); *State v. Brown*, 212 N.J.Super. 61, 513 A.2d 974, *cert. den.* 107 N.J. 53, 526 A.2d 140 (1986); *Kugler v. Ryan*, 682 S.W.2d 47 (Mo.Ct.App.1984); *Hoffart v. Texas*, 686 S.W.2d 259 (Tex.Ct.App.1985) *cert. den.*, 479 U.S. 824, 107 S.Ct. 95, 93 L.Ed.2d 46, *reh'g. den.*, 479 U.S. 977, 107 S.Ct. 478, 93 L.Ed.2d 423 (1986); *Fairfield Commons Condominium Association v. Stasa*, 30 Ohio App.3d 11, 506 N.E.2d 237 (1985); *Brown v. Davis*, 203 N.J.Super. 41, 495 A.2d 900 (1984).

8. The cases on which plaintiffs rely in making their first amendment claim are inapplicable to this case. In *Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382 (1981), a private college invited a community audience to attend a speech by the Director of the Federal Bureau of Investigation. The Court found that by taking such action, the university had made itself into a public forum with respect to that particular speech and therefore could not prohibit peaceful protest of it. The NEWC abortion clinic has taken no action which would transform it into a public forum. In *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987), the Court struck

Plaintiffs' opposition to abortion appears to be a sincere and deeply held view. This fact, however, is insufficient to give plaintiffs a privilege to express their views by invading the private property of those with whom they disagree. The First Amendment does not guarantee a right to commit defiant trespass.[9] Those who engage in civil disobedience on private property must pay the price: arrest and prosecution.

### *Plaintiffs' Malicious Prosecution Claim* [10]

Plaintiffs also claim that their arrests for defiant trespass constitute malicious prosecution.[11] To succeed in a claim of malicious prosecution, plaintiffs must show: "(1) that the underlying proceeding terminated favorably to the [plaintiff]; (2) that the defendant caused those proceedings to be instituted without probable cause; and (3) malice." *Shaffer v. Stewart,* 326 Pa.Super. 135, 140, 473 A.2d 1017, 1020 (1984) (quoting *Junod v. Bader,* 312 Pa.Super. 92, 95, 458 A.2d 251, 253 (1983)); 42 Pa.Cons.Stat. § 8351. As I have discussed at length *supra,* the arresting officers did have probable cause to believe that plaintiffs had committed the offense of defiant trespass. As a result, I find that no malicious prosecution occurred.

An appropriate judgment follows.

down a Board of Airport Commissioners resolution banning all "First Amendment activities" within the "Central Terminal Area" of the Los Angeles International Airport. The Court held that the resolution was facially overbroad, stating: "[u]nder such a sweeping ban, virtually every individual who enters [the airport] may be found to violate the resolution...." *Id.* at ——, 107 S.Ct. at 2569. In contrast, the City of Philadelphia's arrest of plaintiffs does not constitute an overbroad ban.

9. Because I find that the plaintiffs' rights were not violated, I do not reach the issue of whether the City has qualified immunity.

10. Once the Court disposes of the plaintiffs' federal claims, the decision to retain jurisdiction over the pendent state law claim lies within the Court's discretion. *Shaffer v. Albert Area School District,* 730 F.2d 910, 912 (3d Cir.1984). In exercising that discretion, the Court must consider principles of comity, judicial economy,

### JUDGMENT

AND NOW, this 13th day of Feb., 1989, judgment is ENTERED in favor of defendant and against plaintiffs.

convenience and fairness to the litigants. *See Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 618–19, 98 L.Ed.2d 720 (1988). Where a plaintiffs' federal claims are eliminated during the early stages of a proceeding, the court has a "powerful reason" to dismiss the pendent claim. *Id.; see also Weaver v. Marine Bank,* 683 F.2d 744, 746 (3d Cir.1982).

In this case, however, the federal claims have been disposed of in an extremely late stage of litigation. As a result, I exercise my discretion to retain jurisdiction over the pendent state law claim.

11. A claim for malicious prosecution accrues at the time that criminal proceedings are resolved in favor of plaintiffs. This occurred on February 18, 1986. *See Deary v. Three Un–Named Police Officers,* 746 F.2d 185, 197 n. 16 (3d Cir.1984). As a result, plaintiffs are within the applicable two year statue of limitations, and their malicious prosecution claim is not time barred.